## MIRIAM WALLSTEDT v. THE SWEDISH HOSPITAL AND OTHERS.[1]

June 29, 1945.

No. 33,957.

*Hanson & Willcox,* for appellant.

*Gillette & Meagher,* for respondent Swedish Hospital.

*Faegre & Benson* and *Raymond Scallen,* for respondent A. E. Johnson.

MAGNEY, JUSTICE.

Defendant The Swedish Hospital operates a hospital in the city of Minneapolis. Plaintiff, its patient, was under the medical and

[1]Reported in 19 N. W. (2d) 426.

surgical care of defendants A. E. Johnson and Paul R. Gronvall, both physicians and surgeons. She claims that she sustained certain injuries caused by the negligence of the defendants, and brought suit against them. Prior to the trial, plaintiff dismissed her action against defendant Gronvall. The court directed a verdict in favor of the hospital. The jury found for defendant Johnson. Plaintiff appeals from the order denying her motion for a new trial.

Plaintiff was taken to the hospital at 9 a. m. on October 27, 1942. She had severe abdominal pain and was acutely ill. Her abdomen was distended and very tense. There was every indication of a perforated lesion within the abdomen. During the day she was in partial shock and unconscious part of the time. Her pulse was rapid and her extremities rather cold. An operation was necessary. At 3:45 in the afternoon, she was taken to the operating room, operated upon, and at 5:40 returned to her room. Defendants Johnson and Gronvall performed the operation. They found free bowel contents which filled the abdominal cavity, a hole in the intestines from which this fecal matter had issued, and coils of intestines looped and attached and matted together by such matter and the inflammatory reaction to it. Incipient peritonitis was found. The blood vessels of the mesentery were thrombosed, that is, clotted blood shut off the blood supply to certain loops of the intestines. An area of the bowel was gangrenous and practically dead from loss of blood supply. Plaintiff's condition on the operating table was so critical that it was extremely doubtful whether she could survive even the simplest form of surgical correction. Dr. Johnson stated that the anesthetist reported that her condition was "worsening," so the surgeons determined to do the minimum amount of surgery necessary to save her life. The risk had to be taken to close the tear in the bowel. They quickly repaired the perforation and did an entero-enterostomy. After the abdomen had been closed, plaintiff went into acute shock. The anesthetist told the doctors that her condition was critical,—that her pulse was practically gone. Dr. Gronvall stated that the

anesthetist thought the patient had expired. Respiration had stopped. The doctors testified that shock in the acute phase is a vascular collapse. Respiration sometimes ceases, and the blood does not circulate. This is a condition very near death. It cannot go on for long before vital cells die. In the brain, there is a margin of probably six to eight minutes in which circulation must be reëstablished before the patient dies. That was the condition that presented itself to the operating surgeons. Dr. Gronvall gave artificial respiration, but thought it might even be necessary to reopen the wound in order to admit the hand to massage the heart through the diaphragm. Where respiration has stopped, prompt and heroic measures are necessary. Oxygen was given by forced feeding through the gas machines. Blood transfusion was ordered. This was commenced in the operating room and completed in the patient's room. The transfusion was given into the jugular vein, since the blood vessels had collapsed. Edna Hirt, a registered nurse since 1931, assisted. She said it was the only time she had seen a blood transfusion given into a jugular vein. When Dr. Gronvall began artificial respiration, he called for external heat. He said: "The idea was to stimulate, and in stimulating you have to produce local irritation, whether you do that with heat or cold or a punch." Hot-water bottles were brought. Whether there were more than two cannot be determined from the record. One bottle was placed between the legs high up near the crotch, and the other beneath the left axilla. To get a quicker effect of heat to stimulate circulation in extreme shock, hot-water bottles are placed close to the larger vessels in the armpits and the groin. Who placed these water bottles is left in uncertainty. One nurse testified that Dr. Gronvall placed them, but he states that he was busy and did not see them placed. It is apparent that the critical situation caused a great deal of confusion, and doctors and nurses were working under stress. There was a call for quick, decisive treatment to bring the patient out of shock, and the treatment so given undoubtedly saved her life.

Plaintiff claims that at 6:30 she felt a "terrible pain" in her left leg, and she placed her hand on the painful area. A notation on the hospital records made by the special nurse mentions a reddened area on the left leg near the groin. During the night, Unguentine was applied to vesicles on the left leg, and the next day the area was cleaned with alcohol. Mercurochrome was applied, and later other drugs. The hospital records refer to the lesion as a "burn" or "burned area." In a week, crust formed over the area. It developed into a serious lesion, which did not heal for several months, and left quite a scar. Plaintiff claims that this condition of her left leg was caused by a burn from a hot-water bottle and was due to the negligence of defendants. This defendants deny. On this issue, the court directed a verdict for the hospital when it rested at the close of plaintiff's case without offering any testimony, and submitted to the jury the question of defendant Johnson's negligence. The jury found in his favor.

In St. Paul-Mercury Ind. Co. v. St. Joseph's Hospital, 212 Minn. 558, 4 N. W. (2d) 637, this court held that when a hospital assigns its nurses to a duty for an operating surgeon in its operating room and surrenders to the surgeon the direction and control of the nurses in relation to the work to be done by them, the nurses become the servants of the operating surgeon insofar as their services relate to the work so controlled and directed by the surgeon, and the hospital is no longer liable for torts committed in such controlled and directed work. Under this rule and the facts in this case, no liability can be fastened upon the hospital for what plaintiff claims happened in the operating room. There is no testimony to the effect that after plaintiff had been taken to her room hot-water bottles were placed in her bed by the attending nurses prior to and up to the time the reddened area on her left thigh was noted on the chart at 7:40 p. m. Ruth Wallstedt, plaintiff's sister and a witness for plaintiff, remained in the corridor during the operation and was either in plaintiff's room or near the entrance to it from shortly after the operation until 10 o'clock.

She witnessed the blood transfusion. She saw no hot-water bottles taken in or carried away, or, in fact, used. There is no other testimony indicating that hot-water bottles were taken into the room. Under such facts and absence of facts, the court was clearly right in directing a verdict for the hospital.

In considering plaintiff's claim against defendant Johnson, it becomes necessary to recite in detail the evidence relative to the lesion on her left leg and its claimed cause. Dr. Johnson testified that he saw the reddened area the morning after the operation. It was just below the groin on the left thigh. In his opinion, various things could have caused it—hot, dry heat; moist heat producing a scald; or materials used in preparation for the operation producing a chemical burn. Because of the excessive pain plaintiff complained of from the lesion, he thought it might be herpes zoster. This is a condition which has its origin in the nerves. It may occur along the spinal nerve in the upper thigh. It usually occurs on only one side and has the appearance of a burn. Dr. Johnson stated:

"The area is reddened at first and then vesicles form the same as in a burn. * * * In the thigh, because of the terminal character of the nerve, it may spread out and form a larger lesion. Ordinarily, herpes zoster does not cause a great deal of destruction of the skin, but it may do that."

Because of the vascular collapse, he said the condition might possibly be caused by thrombosis or a clotting of the collapsed blood vessel. He stated that very definitely it could be from a combination of causes. The lesion healed rather slowly for a burn, he said, and the ulcer or ulcerated condition had a bearing on the matter of determining what condition actually was presented for treatment. The ulcerous condition was, in his opinion, due to a combination of circumstances or causes.

"Q. And would some of those causes be causes other than a burn?

"A. Yes, a neurogenic cause that I have mentioned, or the possibility of thrombosis."

Dr. Johnson said it was impossible to say definitely what these causes were.

Dr. Gronvall saw the spot two or three days after the operation. He said it looked like a condition one would expect to find in an area that had been burned. There are other skin conditions that resemble burns, and it was conceivable, he said, that the blood vessels might have become thrombosed. He testified:

"This may have been a burn, and it may have been something else. * * * burns don't necessarily mean fire, nor do they mean heat."

He thought it was not due to a burn, but "more likely that it would be a burn." The fact that the hospital records described the lesion as a "burn" or "burned area" does not necessarily imply that it was a hot-water-bottle burn.

Dr. Otto W. Yoerg, a witness called by Dr. Johnson, stated that there was no way of knowing what caused the scar. He said:

"It may have been due to a burn. It may have been due to a chemical burn. It may have been due to poison or ether that may have been used in preparing the abdomen and that got under the dressings. Of course, if it is covered over it will burn very deeply frequently. I have no way of knowing whether this was caused by a hot-water bottle."

He said it could have been due to herpes zoster, but that that was probably a little more remote. He also said that it could have been the result of a thrombosis following a vascular collapse. It was his opinion that if the hot-water bottle had been placed between the legs and both thighs had been touching the bottle it should have burned both sides of the inner portions of the thigh.

Dr. Theodore J. Catlin of Buffalo, Minnesota, was called as a witness for plaintiff. He first saw her for the purpose of treatment on December 26, 1942. Her leg showed a lesion. Plaintiff

told him she had received a burn, and Dr. Catlin stated that it had the appearance of a burn lesion. From her statement, he assumed that the lesion was a burn. On cross-examination, he said an irritation of the skin can be caused by many things, such as burns from heat, burns from acid, and burns from some kind of medication. He was asked:

"Q. And there may be a thrombosis of the blood vessels that may cause a lesion?

"A. I am sure it might cause a lesion, yes."

He was also asked:

"Q. So that in a given situation where there is a tissue destruction, that alone does not establish with any degree of certainty surely that there is a burn from the application of heat of a particular type?

"A. No."

He said that vesicles could be caused by a burn, but that they could be caused by other things too.

On all the evidence in the case, it is apparent that no one can successfully claim that Dr. Johnson was guilty of negligence as a matter of law. The verdict of the jury exonerating him of the charge of negligence is well supported by the testimony. There remains for consideration, however, the claims made by plaintiff that the court erred in its charge to the jury, in its refusal to give several requests to charge made by plaintiff, and in its ruling sustaining defendants' objection to the admission of certain exhibits.

The court refused to submit the doctrine of *res ipsa loquitur* as requested by plaintiff. She claims that the lesion found on her left leg near the groin was caused by a burn from a hot-water bottle and that the doctrine of *res ipsa loquitur* applies. Although the court refused to instruct on *res ipsa loquitur* as requested by plaintiff, it told the jury that "the law is that the jury may draw such reasonable inferences as the proven facts in this case justify, but such inferences and conclusions must be based on reason and not on speculation or guess." In our opinion, plaintiff was not

entitled to an instruction permitting the jury to apply the doctrine of *res ipsa loquitur* to the facts presented to them. In this case, there is evidence that a lesion such as we have here could have been produced by one of several causes, not necessarily by a burn from a hot-water bottle. In cases involving a similar lesion or burn, there has been no question that the burn was caused by a hot-water bottle. Not so here. We have set out in detail the testimony along that line. Even Dr. Catlin, who appeared for plaintiff, expressed such opinion. It is evident that testimony by medical experts is necessary to determine the cause of such a lesion as this. It had several characteristics distinguishing it from an ordinary hot-water-bottle burn.

In Yates v. Gamble, 198 Minn. 7, 268 N. W. 670, a malpractice case, this court held that the doctrine of *res ipsa loquitur* did not apply, since opinion evidence of medical experts was necessary to make out a case. In this case, opinion evidence also was necessary to make out a case. It, too, is in the nature of a malpractice case. Plaintiff apparently realized this and called Dr. Catlin as her witness to give his opinion as to the cause of the lesion. In Heffter v. Northern States Power Co. 173 Minn. 215, 218, 217 N. W. 102, 103, this court stated:

"* * * Nor does it [doctrine of *res ipsa loquitur*] apply where an unexplained accident may be attributable to one of several causes for some of which defendant is not responsible."

On the evidence in this case, we conclude that the doctrine has no application, and that plaintiff was not entitled to an instruction permitting the jury to apply the doctrine to the facts presented to them.

Plaintiff cites the late case of Ybarra v. Spangard, — Cal. —, 154 P. (2d) 687, in support of her position. That case involved an action for damages for personal injuries alleged to have been inflicted on plaintiff by defendants during the course of an appendectomy. When plaintiff awoke he claims that he felt a sharp pain about halfway between his neck and the point of his right

shoulder. A paralysis developed. Plaintiff's experts testified that it was of traumatic origin, not arising from pathological causes and not systemic. The main defenses of defendants there, as stated by the court, were (1) that where there are several defendants and there is a division of responsibility in the use of the instrumentality causing the injury and the injury might have resulted from the separate act of either one of two or more persons, the rule of *res ipsa loquitur* cannot be invoked against any one of them; and (2) that where there are several instrumentalities and no showing is made as to which caused the injury or as to the particular defendant in control of it, the doctrine cannot apply. The court held the doctrine applicable. As to instrumentalities, the court said (— Cal. —, 154 P. [2d] 690):

"* * * It should be enough that the plaintiff can show *an injury resulting from an external force applied* while he lay unconscious in the hospital; this is as clear a case of identification of the instrumentality as the plaintiff may ever be able to make." (Italics supplied.)

In the Ybarra case, there seemed to be no question that plaintiff's condition was of traumatic origin. He received unusual injuries while unconscious. Not so in the instant case, where medical testimony was to the effect that plaintiff's lesion could have been the result of one of several causes. The court in the Ybarra case closes its opinion with this language (— Cal. —, 154 P. [2d] 691):

"We do not at this time undertake to state the extent to which the reasoning of this case may be applied to other situations in which the doctrine of res ipsa loquitur is invoked. We merely hold that *where a plaintiff receives unusual injuries* while unconscious and in the course of medical treatment, all those defendants who had any control over his body or the instrumentalities which might have caused the *injuries* may properly be called upon to meet the inference of negligence by giving an explanation of their conduct." (Italics supplied.)

Plaintiff assigns as error the court's refusal to receive in evidence plaintiff's Exhibits B and C. These were pictures of plaintiff's leg on January 18, 1943, while the healing process was going on. Plaintiff claims that the exhibits should have been received so that the jury might determine from them whether the injury was caused by a hot-water-bottle burn or from some other source suggested by defendants. The jurors were not experts and therefore not qualified to make a diagnosis as to the cause of the lesion. There was no error in the court's ruling.

Plaintiff assigns other claimed errors in the court's charge to the jury. We have examined them all and find nothing which would justify the granting of a new trial.

Order affirmed.