# ELSIE A. SWIGERD v. CITY OF ORTONVILLE AND OTHERS.[1]

February 10, 1956.

No. 36,683.

---

[1]Reported in 75 N. W. (2d) 217.

340

*Eastvold & Pflueger,* for appellant.
*Meagher, Geer, Markham & Anderson, David W. Nord,* and *O. C. Adamson II,* for respondents.

MATSON, JUSTICE.

Plaintiff, trustee for the surviving spouse and next of kin of the decedent, appeals from a judgment for the defendant.

Joseph C. Swigerd, plaintiff's decedent, suffered a cerebral hemorrhage on October 19, 1953, and on that date he was admitted to the Ortonville Municipal Hospital. Sometime thereafter he developed a bedsore which required treatment by the use of a heat lamp. On November 5, 1953, decedent received burns as a result of a fire which ignited during the course of a heat-lamp treatment and burned a part of the mattress and sheet of the bed on which he was lying. Three days later, on November 8, decedent died. He was then 64 years of age. This action was begun by Elsie A. Swigerd, his widow, as trustee for the surviving spouse and next of kin of decedent. The case was tried May 19 to 21, 1954. After all the evidence was in, the trial court directed a verdict for the hospital board of the city of Ortonville and for Helen Hartnett, superintendent of the hospital, who were defendants. The jury found for the plaintiff against defendant city of Ortonville (hereinafter referred to as city)

in the amount of $7,500. Subsequent to the verdict, the trial court granted the city's motion for judgment notwithstanding the verdict. Judgment was thereafter entered for the city and this appeal followed.

Plaintiff assigns as error that the trial court erred in directing a verdict for the hospital board and for Helen Hartnett, hospital superintendent. No authorities are cited and no argument is made in support of this assignment. An assignment of error based on mere assertion and not supported by any argument or authorities in appellant's brief is waived and will not be considered on appeal unless prejudicial error is obvious on mere inspection.[2] On the record presented no obvious error appears.

The issues for determination involve (1) whether the burns sustained by the decedent were proximately caused by any negligence imputable to the hospital and therefore to the defendant city, (2) whether the burns sustained by the decedent were a proximate and contributing cause of decedent's death, and (3) whether the damages are excessive.

We have not overlooked the rule that instructions to the jury which have not been properly challenged pursuant to Rules of Civil Procedure, Rule 51, become the law of the case. The instructions herein submitted to the jury the issue of whether hospital employees had been negligent in the manner in which they manipulated the heat lamp subject, however, to the express limitation that nurses who obey and diligently execute the orders of attending physicians and surgeons to the letter cannot be held negligent unless the order given to them is in itself so obviously fraught with negligence that a reasonably careful person would know that injury would result. Before passing on the question of whether the evidence sustains the jury's finding of negligence, it becomes necessary to explore and define the area of negligence for which a hospital may be liable in caring for a physician's patient where he orders a certain type of treatment without prescribing in detail its manner of performance.

---

[2]Shepstedt v. Hayes, 221 Minn. 74, 21 N. W. (2d) 199; Kaehler v. Kaehler, 219 Minn. 536, 18 N. W. (2d) 312; Kugling v. Williamson, 231 Minn. 135, 42 N. W. (2d) 534.

342

 Assuming the existence of negligence, was it imputable to the hospital? In this jurisdiction a hospital, private or charitable, is liable to a patient for the torts of its employees under the doctrine of respondeat superior.[3] When, however, the hospital assigns one of its nurses (who is in its general employ) to perform a duty for a surgeon or physician in operating upon or in actually treating a patient, and with respect to the performance of such designated duty surrenders direction and control over the nurse to such surgeon or physician, the nurse thereby becomes the servant of the other insofar as her services relate to the controlled work, and the hospital ceases to be liable for the negligence of the nurse while actually performing such controlled work.[4]

 The application of the loaned-servant rule is free from difficulty where the actual control of the servant, or the right thereto, necessarily becomes vested in the surgeon when the nurse is assigned to assist him during the actual performance of an operation over which he must have exclusive direction[5] or where the nurse is administering a prescribed treatment under the direct and personal supervision of the physician.[6] Difficulty in the application of the rule arises primarily with respect to acts performed by hospital employees either before or after an operation, or performed in

[3]Mulliner v. Evangelischer Diakonniessenverein, 144 Minn. 392, 175 N. W. 699; St. Paul-Mercury Ind. Co. v. St. Joseph's Hospital, 212 Minn. 558, 4 N. W. (2d) 637; see, 4 Minn. L. Rev. 533.

[4]St. Paul-Mercury Ind. Co. v. St. Joseph's Hospital, *supra.*

[5]It has been held that a surgeon may of immediate necessity be compelled to abandon this absolute control during an operation when a sudden emergency arises which compels him to devote his entire time to save the patient's life from heart failure, and when he so abandons the control of necessity, he is not responsible for the negligence of the nurse who burns the patient with overheated bricks. See, Marchand v. Bertrand, 39 Que. Super. 49; Flower Hospital v. Hart, 178 Okl. 447, 62 P. (2d) 1248 (and Annotation, 60 A. L. R. 152), wherein Marchand case is summarized. Compare Wallstedt v. Swedish Hospital, 220 Minn. 274, 19 N. W. (2d) 426, wherein the injuries may have resulted from more than one cause.

[6]See, Byrd v. Marion General Hospital, 202 N. C. 337, 162 S. E. 738.

the course of administering medical treatment prescribed by a physician who is not present to give personal supervision.[7]

Whether the assignment by the hospital of one of its nurses to the care of a patient involves a surrender of control to the attending physician so that the hospital ceases to be responsible for the negligent acts of the nurse can best be ascertained in the light of the recognized function of a modern hospital and the generally accepted limitations on a physician's time. A physician can spend only a short time at the bedside of each patient and he must therefore leave the actual fulfillment of his prescribed treatment to others less skilled. If this were not the accepted practice, no person of moderate means could afford to employ either a specialist or a general practitioner.[8] A patient enters a hospital in reliance upon the reasonable assumption that its trained staff of nurses, its responsible supervision, and its special equipment will insure him a higher standard of care in administering to his needs as his physician may prescribe. If this assumption were not justifiable, the patient might just as well stay at home during his illness. Clearly, a hospital has a greater responsibility for the welfare of its patients than merely to maintain a pool of trained nurses from which the various attending physicians may select their assistants. Many courts have increasingly recognized that a hospital has a responsibility for the exercise of due care by a nurse (as well as by other hospital employees) while she is performing acts of a character which, though constituting a part of the patient's treatment as prescribed by the attending physician, do not require either the application or the understanding of the specialized technique possessed by a skilled physician or surgeon.[9] In taking this view these courts classify the acts of nurses

[7]See, St. Paul-Mercury Ind. Co. v. St. Joseph's Hospital, 212 Minn. 558, 561, 4 N. W. (2d) 637, 639.

[8]See, Hunner v. Stevenson, 122 Md. 40, 89 A. 418; Annotation, 60 A. L. R. 147, 150.

[9]See, Dillon v. Rockaway Beach Hospital, 284 N. Y. 176, 180, 30 N. E. (2d) 373, 374; Rabasco v. New Rochelle Hospital Assn. 266 App. Div. 971, 44 N. Y. S. (2d) 293, 294; Pivar v. Manhattan General, 279 App. Div. 522, 110 N. Y. S. (2d) 786; Flower Hospital v. Hart, 178 Okl. 447, 62 P. (2d) 1248;

344

and other employees for which a hospital is liable in tort as administrative or clerical acts, and the acts for which it has no such liability as those which require an exercise of medical skill or judgment.[10] Whether an act is merely administrative, so that negligence in its performance is imputed to the hospital, or nonadministrative depends on the nature or character of the act.[11]

No all-embracing definition of what acts are administrative will be attempted but a few illustrations from actual cases will suffice to disclose their nature. It has been held that the order of an attending physician that sideboards be placed on a bed for the patient's protection is a medical determination for which the hospital is not responsible. In contrast, however, the physical or manual act of attaching the sideboards, in compliance with that order, is merely an administrative act since it can be performed by anyone in the hospital's employ and its performance requires no professional knowledge, skill, or experience.[12] Similarly, where a doctor ordered that his patient be served tea, the negligent serving of the tea, whereby the patient was painfully burned, was an administrative act for which the hospital was liable in damages.[13] In the case of Flower Hospital v. Hart, 178 Okl. 447, 62 P. (2d) 1248, the court based liability on the fact that the surgeon, following an operation, had ceased actual supervision and control over a nurse who placed an unshielded light bulb on the flesh of the patient whereby she was burned. In Piedmont Hospital v. Anderson, 65 Ga. App. 491, 16 S. E. (2d) 90, a doctor ordered an electric heating pad to be applied to the patient. In carrying out the order the nurse applied the heating

---

Rice v. California Lutheran Hospital, 27 Cal. (2d) 296, 163 P. (2d) 860; Piedmont Hospital v. Anderson, 65 Ga. App. 491, 16 S. E. (2d) 90; Clerk & Lindsell, Torts (11 ed.) § 619 (containing summary of holdings of British decisions); cf. Malkowski v. Graham, 169 Wis. 398, 172 N. W. 785, 4 A. L. R. 1524, and Olson v. Bolstad, 161 Minn. 419, 201 N. W. 918.

[10]See, 41 C. J. S., Hospitals, § 8, p. 348.

[11]Dillon v. Rockaway Beach Hospital, 284 N. Y. 176, 180, 30 N. E. (2d) 373, 374; Ranelli v. Society of New York Hospital, 49 N. Y. S. (2d) 898.

[12]See, Pivar v. Manhattan General, 279 App. Div. 522, 110 N. Y. S. (2d) 786; Ranelli v. Society of New York Hospital, 49 N. Y. S. (2d) 898.

[13]Rice v. California Lutheran Hospital, 27 Cal. (2d) 296, 163 P. (2d) 860.

pad with the switch on hot instead of on low which would have been proper. The patient was burned. In so doing the court said she was acting as a servant of the hospital and that the hospital was responsible for her negligence since she did not properly carry out the instructions of the patient's physician. These cases illustrate administrative acts for which a hospital is liable for the negligence of its nurses and, by necessary implication, these cases carry with them a recognition that control remains with the hospital when its employees perform nonmedical acts. Where no unusual features are involved which call for an exercise of medical skill or experience, a doctor may reasonably take for granted that the experienced nurses on the staff of a modern hospital will attend to their ordinary and customary duties without detailed instructions. See, Annotation, 4 A. L. R. 1527.

We adopt the rule that a hospital is liable for the negligence of its nurses in performing mere administrative or clerical acts, which acts, *though constituting a part of a patient's prescribed medical treatment,* do not require the application of the specialized technique or the understanding of a skilled physician or surgeon. This rule, in recognizing that the right of control remains with the hospital as the general employer, is consistent with the nature of such acts and is in accord with the custom which in everyday practice governs the relationship between the hospital staff and the attending physicians. It is generally recognized that the nature of the acts performed, and the custom as to the control ordinarily exercised in the performance of similar acts, are factors indicative of where the right of control exists.[14] The administrative or clerical act rule is not contrary to our holding in Mesedahl v. St. Luke's Hospital Assn. 194 Minn. 198, 259 N. W. 819, wherein the sole issue considered was whether the hospital, in the light of the known evidentiary facts as to plaintiff's mental condition, should, in the exercise of due care, have anticipated that he was contemplating escape or self-destruction and therefore should have been put under restraint. In

[14]See, Frankle v. Twedt, 234 Minn. 42, 48, 47 N. W. (2d) 482, 487; Prosser, Torts, § 63; Restatement, Agency, § 220 (2) (c), *comment e,* and § 227, *comment a.*

deciding the Mesedahl case this court assumed the hospital had retained the right of control over its nurses but decided there had been no negligence.[15]

■ In the instant case the giving of the heat-lamp treatment obviously involved nothing more than an administrative act for which the hospital would be liable if negligently performed. The decision that the heat-lamp treatment should be given was a nonadministrative or medical act of Dr. J. F. Karn, the attending physician, but the execution, and the manner of implementing that decision, was merely administrative and did not call for specialized medical skill. The hospital superintendent testified that the distance the lamp was placed from the body, and the duration of each treatment, was governed by a standing order of the physicians. In the light of the evidence, the term "standing order" is indicative of nothing more than an accepted routine procedure which was followed with respect to all heat-lamp treatments. That the treatment was purely routine was confirmed by Dr. J. F. Karn who, upon direct examination, in denying that he had specifically instructed the nurses as to the manner of giving the heat-lamp treatment to the decedent, said:

*"It is a routine that is followed in the hospital,* that is right. They know, or should know, they have been instructed at some time previously, maybe not on this patient, maybe on others that such and such a distance is the customary distance to place the lamp, and for a certain length of time." (Italics supplied.)

Routine acts of treatment which an attending physician may reasonably assume will be performed in his absence by nurses of a modern hospital as part of their usual and customary duties, and the execution of which does not require specialized medical knowledge, are merely administrative acts for which negligence in their perform-

---

[15]The passage from Byrd v. Marion General Hospital, 202 N. C. 337, 341, 162 S. E. 738, 740, quoted in the Mesedahl case, is to be interpreted in the light of the controlling facts involved therein, namely, that the attending physician was present and actively directing the performance of the negligent act.

ance is imputable to the hospital. See, Moeller v. Hauser, 237 Minn. 368, 377, 54 N. W. (2d) 639, 645.

Does the evidence sustain a finding of negligence? Since decedent had fallen out of bed he had been partially restrained by having one arm and the opposite leg tied to the bed. Pursuant to the physician's orders the heat-lamp treatment was begun on October 26 for a bedsore on his left buttock. These treatments were given daily or oftener until the occurrence of the fire. The lamp was placed at the customary distance of about 30 inches from decedent's buttock for a treatment duration of 15 to 20 minutes. The lamp was placed between his bed and the east or door entrance wall of his room. The lamp cord, which was connected to a north wall socket on the west side of the bed, led over the head of the bed but under the decedent's pillow to the lamp. This arrangement was necessary since the cord was too short to be run under the bed and it was deemed unwise to run it over the patient's body. Preparatory to treatment the decedent was placed on his right side near the east edge of the bed. At the time decedent was burned on November 5 he was left in partial restraint to the extent that his right leg was tied to the bed. On the morning of the same day he also received a treatment. During the course of the morning treatment, his wife had visited him and upon her arrival she smelled something burning and upon investigation found that the lamp had burned a brown spot on the sheet. She moved the lamp farther away from the bed. She then, according to her testimony, told two nurses in the corridor what had happened. At about 1:15 p. m. one of the nurses, hearing a noise in decedent's room, opened the door and found that the east edge of the mattress and the bottom sheet were burning. Decedent was then lying on his back and not on his side. The nurse who discovered the fire, assisted by a doctor, rolled the decedent to the west side of the bed to get him away from the fire. The decedent was burned from 20 to 25 percent of his body area. These burns covered his entire left leg from the foot to the hip, his right thigh, certain areas on his buttocks, and also a narrow strip across the lower anterior abdominal wall and parts of his left arm. These burns were not caused by the

rays of the heat lamp but by the flames from the burning mattress and sheet.

Since preparatory to the heat-lamp treatment decedent was placed on his right side and the lamp was located about 30 inches from his buttock, and since defendant had not rolled out of bed when he rolled over on his back, the jury could reasonably conclude that, even though the lamp was placed at the proper distance from his buttock, it had negligently been placed too near the edge of the mattress and bottom sheet. Obviously, if the decedent was initially placed on his right side far enough from the east side so that he would not roll off when he turned on his back, the east edge of the mattress was necessarily only a short distance from the lamp. The jury could also accept as true the testimony of the plaintiff that the lamp during the morning treatment was so close to the bed that a brown spot had been burned on the sheet and that the hospital nurses were thereby and then sufficiently warned of the danger to anticipate that a subsequent igniting of the bed clothes might occur. Again assuming that the jury believed plaintiff's testimony, it could infer negligence from the conversation attributed to Mrs. Hartman, one of the nurses, wherein she said:

"I am as much to blame for this as anyone in the hospital, but Joe [decedent] has sure been patient about it."

We hold that the evidence was sufficient to sustain a finding of negligence by the jury.

■ Was decedent's death caused by the cerebral hemorrhage or by decedent's burns? Were the burns which decedent sustained a proximate and contributory cause of his death? Dr. J. F. Karn testified that the burns covered a surface area of 20 to 25 percent of decedent's body and that they were at least second degree in severity with a portion of them possibly being of the third degree. He also said decedent's temperature began to rise on the morning of November 6 and reached 104 degrees by the morning of November 7 and that such temperature continued until death. In addition, he observed that plaintiff's respiration and pulse increased correspondingly with his temperature and that decedent had to be fed

intravenously on November 6 and given blood transfusions on November 7. Dr. Karn was of the opinion that *the burns hastened or contributed to decedent's death.*

Another expert witness, Dr. William Kaufman, explained that in cerebral hemorrhage cases the temperature usually remains normal but in cases of burns there is a rise in temperature and an increase in the rapidity of the respiration and the pulse. He expressed the opinion *that the burns undoubtedly contributed to the cerebral hemorrhage and hastened decedent's death.* He further said that decedent might have died from the cerebral hemorrhage at any time or that he might have lived on for quite a few years.

Taking the evidence as a whole we cannot say that, pursuant to our decisions,[16] the jury could not reasonably find that the burns were a proximate and contributing cause of death. We have not overlooked the death certificate wherein Dr. J. F. Karn mentioned burns and boils but designated the cerebral hemorrhage as the direct cause of death. A certificate of death, being only prima facie evidence of the cause of death, may be contradicted and explained. Harris v. Wood, 214 Minn. 492, 497, 8 N. W. (2d) 818, 821.

Was a verdict of $7,500 for damages excessive? The funeral bill amounted to $425.95. Decedent had regularly earned from $50 to $60 a week as a bookkeeper for a motor vehicle company. He also had additional earnings from other bookkeeping accounts and from assisting with the preparation of income tax returns. Had he lived, even though physically handicapped to some extent, he could reasonably have returned to his profession. He took an active and

[16]See, Hiber v. City of St. Paul, 219 Minn. 87, 16 N. W. (2d) 878; Saaf v. Duluth Police Pension Relief Assn. 240 Minn. 60, 65, 59 N. W. (2d) 883, 886; Mattfeld v. Nester, 226 Minn. 106, 32 N. W. (2d) 291, 3 A. L. R. (2d) 909. We have not overlooked the case of Briggs v. Minneapolis St. Ry. Co. 52 Minn. 36, 53 N. W. 1019, cited by the defendant in support of its contention that the quantum of proof is insufficient to establish that plaintiff's burns shortened his life or contributed to his death. The Briggs opinion was written by Mr. Justice Mitchell who later in Donnelly v. St. Paul City Ry. Co. 70 Minn. 278, 73 N. W. 157, recognized that the language in the Briggs case was too broad as a general proposition of law unless qualified or limited.

genuine interest in maintaining his family in comfort. We cannot say that the verdict was excessive.

The judgment of the trial court is reversed.

Reversed.