## PEGGY J. MILLER v. MACALESTER COLLEGE AND ANOTHER.

115 N. W. (2d) 666.

May 4, 1962—Nos. 38,270, 38,271.

*Stringer, Donnelly & Sharood,* for appellant Hamm.

*Lipschultz, Altman, Geraghty & Mulally* and *James H. Geraghty,* for appellant college.

*Richards, Montgomery, Cobb & Bassford, Charles A. Bassford,* and *Crane Winton,* for respondent.

THOMAS GALLAGHER, JUSTICE.

Action for injuries sustained by plaintiff, Peggy J. Miller, a student at Macalester College, when she fell from a movable, sectional scaffold furnished the college on a rental basis by defendant Orie L. Hamm, d.b.a. Adjustomatic Scaffold Company. At the time of the accident, the scaffold was in use for the removal of electrical spotlights and fixtures

from the ceiling beams of the college fieldhouse. Plaintiff recovered a verdict against both defendants in the total sum of $21,852.37. Defendants' subsequent motions for judgment notwithstanding the verdict or for a new trial were denied and both have appealed to this court from the order to such effect. Defendant scaffold company also appealed from the judgment entered.

On appeal the college contends that there was no evidence of negligence on its part. The scaffold company contends that (1) there was no evidence of any defects in the scaffold supplied by it; (2) no duty rested upon it to warn of dangers in its use in a manner which could not have been reasonably anticipated; and (3) the court erred in receiving over objection advertising pamphlets of another scaffold company, and in rejecting the portion of the rental agreement covering rental of the scaffold containing a provision wherein the college agreed to indemnify the scaffold company for any damages arising out of the scaffold's use. Both defendants further contend that, as a matter of law, plaintiff was guilty of contributory negligence and assumption of risk in using the scaffold in a manner which involved substantial danger when she might have adopted a course free from danger.

The accident occurred May 16, 1958. At that time, plaintiff, then 24 years of age, was a registered student in the college. As a member of a class in its speech-drama department she was required to participate in a dramatic production and chose to assist with a centennial pageant to be presented in the college fieldhouse under the direction of Douglas P. Hatfield, an instructor in the department. She was assigned to the lighting crew. The scaffold was rented by the college for use in the installation of certain spotlights or fixtures in the ceiling of the fieldhouse and for their removal after completion of the production. Mr. Hatfield, who made all rental arrangements for the scaffold at the time, had instructed the scaffold company merely that he required a movable scaffold which could be erected to a height of 35 feet. Nothing was said as to the purpose for which it was to be used.

On May 6, 1958, the unassembled sections of the scaffold and the wheels therefor were delivered by Mr. Hamm to the fieldhouse of the college and there turned over to a Mr. Norman Olson who at the time was employed by the college as a custodian for this building. It is not

disputed that at the time of the delivery no instructions, either written or oral, were given to anyone as to the assemblage or use of the scaffold. Students of the speech-drama class then joined in assembling the scaffold. The 4 wheels, each approximately 8 inches in diameter, and attached to stems with spring-steel rings thereon, were inserted into hollow tubular posts in the bottom section of the scaffold. As the wheel stems were thus inserted, the spring-steel rings tightened within the tubular posts so that the wheels would not drop off when the scaffold was lifted from the ground.

On May 16, 1958, the day following completion of the centennial celebration production, students of the speech-drama class, including plaintiff, assembled with instructions to remove the spotlights and electrical fixtures. Plaintiff then climbed to the second section of the scaffold where she seated herself in the center. A student on the section above then removed the spotlights or fixtures and handed them down to plaintiff and she in turn handed them down to the ground crew. While the work was being done, the scaffold was rolled on its wheels from place to place on the dirt floor of the fieldhouse. While the scaffold was being moved in this fashion, its front wheels dropped into a small trench dug for the purpose of concealing electrical cables in the floor. This drop caused the front of the scaffold to incline forward with the rear wheels off the floor. While in this position, the wheels dropped from the scaffold and, as the scaffold then inclined backward, the absence of the wheels caused it to topple completely to the ground, throwing plaintiff therefrom and causing the injuries for which this action was instituted.

The evidence discloses that Hatfield had had no previous experience with scaffolds; that he had given no specifications to the scaffold company, beyond telling it that the scaffold should be movable and rise to a height of 35 feet; and that he had instructed his students that they should be sure to sit down on the scaffold while it was being moved and that it should be moved slowly. He testified further that he had inquired as to instructions on the use of the scaffold but that none had been delivered; that immediately after the accident he had observed that the two wheels to the rear of the scaffold had become disconnected.

Mr. Hamm testified that he had received no information from the

college as to the intended use of the scaffold; that he had never dealt with the college before; that in his business he usually dealt with various types of contractors in the building business; that when he delivered the scaffold to the college he drove his truck with the scaffold equipment thereon into the fieldhouse and turned all of such equipment over to Olson who was in charge of the building; that prior to such delivery he had casually checked the wheels and that all of them seemed to be in good condition; that if the wheels were not defective and had been properly inserted they would not fall off the scaffold when it was lifted from the ground; that at the time of delivery he gave no written or oral instructions to Olson or anyone else as to the use or assemblage of the scaffold. Because the various sections and wheels were interchangeable and had been separately stored after being returned to the scaffold company, he could give only general information as to the parts delivered. He testified that he had received orders to pick up the scaffold after the centennial production and had done so; that it had been dismantled and the various sections placed in storage so that it was impossible after this time to ascertain which sections or wheels had been used by the college. He testified further that a scaffold 35 feet in height with base dimensions of 5 feet by 7 feet, such as the one here furnished, should not be moved with a person on it but that he did not recall so instructing anyone at the college; and that at the time of the delivery of the scaffold Olson had signed the regulation rental receipt of the scaffold company. He explained the operation of the tension ring, or friction circle as he designated it, which encircled the stem attached to the wheel, indicating the manner in which the ring was inserted within the interior of the section tube so as to secure the wheel stems. He testified that, when he picked up the equipment after the production, the tension rings or friction circles were still attached to the wheel stems and that he did not observe any defects therein.

Mr. Fred R. Prouse, manager of Waco Scaffolding Company, called on behalf of plaintiff, testified that he was familiar with safety recommendations of various scaffold manufacturers in the use of movable or rolling scaffolds. He identified catalogues of Waco Scaffolding Company, Patent Scaffolding Company, Advance Scaffolding Company, and Safway Steel Products, Inc., which contained the respective recom-

mendations of these firms as to the safe use of rolling scaffolds. The catalogues of these firms were received in evidence over defendant company's objection. Mr. Prouse testified that as a general practice the industry recommended that scaffolds of the type here involved not be moved while anyone was on them; that it was a common practice in the industry to use the tension ring or friction circle on the wheel stem to secure the wheels to the scaffold; and that if a wheel dropped off of the sectional tube when the latter was lifted off the floor this might indicate that the tension ring was broken, but that if such a ring were broken it would not remain on the wheel stem.

Mr. Norman Olson testified that he had signed a receipt for the various sections of the scaffold when it was delivered but that he had had very little conversation with the man who delivered them; that he was not then or at any other time instructed as to the manner in which the scaffold should be assembled or used; that the man delivering the scaffold had stated that it was to be used in putting up decorations in the ceiling of the fieldhouse; that Olson had had nothing to do with assembling, using, or dismantling the scaffold and did not inspect it at any time; and that he had not been there at the time the accident happened. He admitted that, in a prior statement, he had told an investigator that after the scaffold had fallen the wheels were still attached thereto and at the trial stated that he was pretty sure that this was correct. It is not disputed that his attention was not directed to the printed portion on the reverse side of the receipt in which the college agreed to indemnify the scaffold company and that he had not been asked to sign it on the reverse side.

Mr. Byron H. Morrill testified that he was a student at the college and present at the time of the accident; that he was then engaged in moving the scaffold; and that as it toppled forward, after the front wheels had dropped into the trench, he observed the rear wheels fall off so that when the scaffold tipped back to an upright position the scaffold had "continued backward * * * and that is when it fell."

At the close of the testimony the scaffold company moved for a directed verdict upon the ground that no obligation rested upon it to warn or instruct as to the use of a simple appliance such as the scaffold involved; and on the further ground that evidence with respect to defects

therein was too speculative and conjectural to support a finding of negligence. Macalester College moved for a directed verdict on the ground that there was no evidence of negligence on its part. Both defendants moved for a directed verdict on the ground that plaintiff was guilty of contributory negligence and had assumed the risk of injury as a matter of law. Macalester College also asserted that the sole proximate cause of the accident was the negligence of plaintiff's fellow students, which should be imputed to her.

The trial court denied these motions and ruled that the indemnity provisions on the reverse side of the delivery receipt were not binding upon the college, since none of its authorized agents or officers had executed it.

The court's instructions included the following:

"* * * The defendant Hamm [scaffold company] owed a duty * * * to exercise reasonable care to furnish reasonably safe equipment for the use which he knew or should have known in the exercise of reasonable care was intended. * * * Hamm is not an insurer of the safety of the equipment which he furnished. * * * The fact * * * that there were some defects in the equipment * * * is not enough to charge him with negligence in this respect. * * * If there are some defects in the equipment, which would not be discoverable upon reasonable inspection, he would be liable only if he had actual notice of that defect. * * * Hamm also owed the duty to warn or instruct the persons in charge of the operation, in this case the College faculty, or some member thereof, of any peculiar hazards or risks involved in the use of the scaffold of a kind which would not be readily discoverable or observable to the persons using the scaffold. * * * In determining what warning or instruction * * * the exercise of reasonable care would require, you should take into consideration the * * * probable experience of the users * * * so far as it * * * should have been known to him [Hamm] if he exercised reasonable care. When equipment such as a scaffold * * * is rented to a person who is without experience in the use of such articles ordinary care on the part of the owner of the scaffold would require some warning or instructions if there were any peculiar hazards, and might require more warning or instruction than

would be required if the article was to be rented or was being rented to a contractor or other person of experience in the use of such articles. * * * the defendant Hamm was not bound to anticipate that it would be used in a negligent or unsafe manner."

The court further instructed the jury:

"* * * It was the duty of * * * Macalester College to exercise reasonable care to provide reasonably safe equipment for the use of the students of this operation * * * to use reasonable care to provide a reasonably safe place in which to use that equipment * * * to exercise reasonable care in the supervision and management of the operation in which the students were engaged as part of their course of instruction; to exercise reasonable care in the matter of warning the students of any hazards or dangers, which would not be apparent to and readily observable by the students themselves. * * * to exercise reasonable care in the manner of instructing the students as to the proper and safe methods of using the equipment, and generally to exercise reasonable care in the work incident to and a part of the general project being performed by the students under the direction of the faculty."

With respect to plaintiff, the court instructed the jury:

"* * * The only claim which the defendants assert in this action is that the plaintiff herself was negligent in remaining on the scaffold while it was being moved. * * * a person is not completely excused from exercising ordinary or reasonable care by obeying the orders of his superior, but in determining whether a person has been guilty of contributory negligence it is permissible for the jury to take into consideration the orders and directions of those in authority over her. Contributory negligence cannot be predicated upon the compliance with a superior's order unless the danger is so imminent and so obvious and apparent to the ordinary mind that it would be unreasonable for the injured person to comply with the orders and instructions of this superior.

"It is also asserted * * * that the plaintiff assumed the risk of injury. * * *

"* * * If * * * the plaintiff knew, understood and appreciated

that it was dangerous to remain upon the scaffold while it was being moved, and with that knowledge * * * voluntarily remained upon the scaffold she cannot recover damages. * * * it appears here without dispute that the plaintiff was instructed by the faculty member in charge * * * to remain upon the scaffold while it was being moved. Consequently, she cannot be charged with assuming the risk of injury or be held to be guilty of contributory negligence in remaining upon the scaffold unless * * * the preponderance of the evidence shows that the danger was so obvious that a person of ordinary prudence would not have followed or obeyed the instructions of the faculty member * * *."

The scaffold company excepted to the instructions quoted having reference to it and contends that, as a matter of law, it was free from negligence. Macalester College excepted to the instructions imposing upon it the duty of providing a reasonably safe place to work. Both parties excepted to the instruction permitting the jury to find plaintiff not guilty of contributory negligence and to find that she had not assumed the risk of injury in following orders of Hatfield unless danger was so apparent that it would have been obvious to a reasonably prudent person.

■ The case was submitted on the theory that one supplying a chattel for another, and aware that the other's intended use thereof may involve danger, is required to exercise reasonable care to ascertain if the chattel is safe for such use; to instruct the intended user as to the proper method of using it and as to attendant risks or dangers if such methods are not followed; and, where such use is to be under the directions of the supplier, to provide reasonable supervision thereof. No exceptions were taken to such instructions. This imposed upon the college the duty to ascertain whether the scaffold was safe for use at a height of 35 feet in installing and removing ceiling light fixtures in the fieldhouse, as well as the proper method of assembling and using it for such purpose. It required that plaintiff and others who were to use the scaffold under Hatfield's directions be given reasonable instructions by him as to the methods to be followed and warnings as to risks of injury which might otherwise follow, and afforded reasonable super-

vision of the work they were to perform, particularly where, because of inexperience, they may have been unaware of the risk involved in using the scaffold.

The court's instructions as to the duties thus imposed upon this defendant find support in numerous decisions of this court, particularly those relating to public hospitals and their responsibilities to patients being treated by hospital employees. Nelson v. The Swedish Hospital, 241 Minn. 551, 64 N. W. (2d) 38; Swigerd v. City of Ortonville, 246 Minn. 339, 75 N. W. (2d) 217, 72 A. L. R. (2d) 398. They are further in accord with the principles set forth in Restatement, Torts, §§ 388, 390, approved by this court in Mikel v. Aaker, 256 Minn. 500, 504, 99 N. W. (2d) 76, 79, where it is stated:

§ 388. "One who supplies * * * a chattel for another to use, is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be in the vicinity of its probable use, for bodily harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier

* * * * *

"(b) * * * has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition; and

"(c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be so."

§ 390. "One who supplies * * * a chattel for the use of another whom the supplier knows or from facts known to him should know to be likely because of his youth, *inexperience* or otherwise, to use it in a manner involving unreasonable risk of bodily harm to himself and others whom the supplier should expect to share in, or be in the vicinity of its use, is subject to liability for bodily harm caused thereby to them." (Italics supplied.)

■ Under these applicable doctrines the evidence submitted adequately supports the jury's finding as to the negligence of the college. It clearly indicates that its instructor, Hatfield, in charge of the centennial production, may have failed to exercise reasonable care in inspecting the scaffold to learn if it were safe; in determining the proper method

of assembling it; and in ascertaining a safe method to be followed in the work to be performed with it. If he were uninformed as to such matters, it would seem reasonable to hold that the duty rested upon him to learn about them before turning the equipment over to his students with general instructions to engage in work in which a risk of injury was involved. Further, the jury might find him negligent in failing to properly supervise the work which he was directing. Brigham Young University v. Lillywhite (10 Cir.) 118 F. (2d) 836. We have not followed the rule that charitable institutions such as hospitals are exempt from tort liability, 9 Dunnell, Dig. (3 ed.) § 4250a, and upon the principles applied in such cases would not exempt colleges therefrom. See, Annotation, 160 A. L. R. 250.

■ It is our opinion that the trial court's instructions as set forth above correctly stated the applicable law with reference to the scaffold company and that the evidence submitted was sufficient to sustain the verdict as to its negligence. In its capacity as bailor of the scaffold, the duty rested upon it to exercise reasonable care to furnish equipment which could be used with safety in the work for which it was intended. Here, the defendant college had made known to it that such use would require a movable scaffold reaching 35 feet in height. The jury could believe that at the time of its delivery to the college this defendant's representative, Hamm, had stated to the custodian in charge of the fieldhouse that the scaffold was to be used in placing decorations in the fieldhouse ceiling and hence knew the use intended for it. The delivery truck had been driven by Hamm into the fieldhouse so its dirt floor must have been observed by him. It is not disputed that he was aware that the manufacturer had recommended that, to eliminate rackage, horizontal bars be installed if the scaffold were to be more than 15 feet high; and that recognized safety practices in the industry required that no one remain on a scaffold of this kind while it was being moved. He admitted that if the wheel stems, which the tension rings encircled, were in proper condition they would not fall out of the tubes when the scaffold was raised from the ground. Upon such evidence, the jury could properly find that this defendant was negligent in supplying a scaffold defective for the purpose of its intended use; and in the failure to warn of dangers or risks involved in moving the scaffold on the dirt floor

with a person seated thereon, particularly where the intended users were inexperienced in such matters.

In this situation it seems clear that the principles set forth in Restatement, Torts, §§ 388, 390, *supra,* were properly applied to this defendant also. In Manteuffel v. Theo. Hamm Brewing Co. 238 Minn. 140, 149, 56 N. W. (2d) 310, 316, which involved the use of a scaffold, this court stated:

"* * * in considering whether equipment is safe *in a particular situation,* the circumstances under which it is to be used is always one of the factors which determine whether or not it is safe. * * *

\* \* \* \* \* \*

"While it is true that before there can be negligence there must be knowledge, actual or imputed, of the facts out of which the alleged duty arises, imputed knowledge may follow from facts proved without showing actual knowledge. Where, as here, defendant furnishes equipment for a particular use, having knowledge of the conditions under which it is to be used, knowledge of the dangers which are inherent in such use may be imputed."

Based upon such principles, we have held that suppliers of machinery or equipment may be found negligent upon the theory that, where they knew or should have anticipated that inexperienced operators might use it in a particular manner, the duty rested upon them to warn such operators as to dangers attendant upon the intended use. Johnson v. West Fargo Mfg. Co. 255 Minn. 19, 95 N. W. (2d) 497; Lovejoy v. Minneapolis-Moline Power Implement Co. 248 Minn. 319, 79 N. W. (2d) 688; Hartmon v. National Heater Co. 240 Minn. 264, 60 N. W. (2d) 804. This rule has been applied where the chattel supplied is not inherently dangerous, but where the use contemplated might make it so. Mikel v. Aaker, *supra.*

■ Hanrahan v. Safway Steel Scaffold Co. 233 Minn. 171, 46 N. W. (2d) 243, relied upon by defendant scaffold company, is distinguishable upon the facts. There, the sole claim of negligence was that the scaffold furnished was defective. There this court held that the evidence submitted to support such claim was too speculative and conjectural in that in the lapse of time between the date when the

scaffold was delivered and the date upon which it collapsed other workmen were present who might have damaged it; and in that there was no testimony as to whether the breakage occurred when the scaffold tipped over and fell upon the cement floor or was attributable to defects in equipment which existed at the time it was delivered. Here, the claims of negligence are based upon grounds additional to those relating to defective equipment, and the evidence submitted to establish all such claims is sufficiently definite in the opinion of this court to sustain the jury's findings thereon.

■ With respect to the defendants' contention that plaintiff was guilty of contributory negligence and had assumed the risk of injury as a matter of law, we are in accord with the trial court's action in submitting such issue to the jury. It seems quite clear from the record that plaintiff was inexperienced with respect to the proper use of the scaffold of the type furnished. She was instructed to assist the other students in using it to remove the light fixtures from a rather high ceiling. At no time was she warned that it might be dangerous to remain on the scaffold while it was being moved from place to place on the dirt floor. It was so moved under the observation of her instructor without protest. She testified that she was unaware of any risks involved in such use and had no warnings with respect thereto. The court's instructions with respect to the issue of contributory negligence and assumption of risk which are set forth above appear to state clearly the applicable principles as frequently stated by this court in analogous situations. Baumgartner v. Holslin, 236 Minn. 325, 52 N. W. (2d) 763; James v. Chicago, St. P. M. & O. Ry. Co. 218 Minn. 333, 16 N. W. (2d) 188; Johnson v. Land O'Lakes Motor Co. 218 Minn. 404, 16 N. W. (2d) 466; Wright v. Holland Furnace Co. Inc. 186 Minn. 265, 243 N. W. 387; Dimetre v. Red Wing Sewer Pipe Co. 127 Minn. 132, 148 N. W. 1078.

■ Defendant scaffold company asserts that the trial court erred in receiving in evidence certain advertising folders of other scaffold manufacturers with their recommendations as to safety practices in the use of scaffolds similar to the kind here involved. These were objected to by this defendant only on the ground that they were incompetent, irrelevant, and immaterial and in no way binding upon the defendant.

No objection was made as to the foundation for their admission or on the ground that they constituted hearsay as now urged on appeal. Mr. Prouse, called by plaintiff, qualified as an expert in the industry and testified that sectional scaffolds, regardless of the manufacturer, are basically the same in construction and design and in the manner in which the end sections fit together; that he was familiar with the recommendations of various manufacturers as to safe practices in the use of such scaffolds; that in the industry it is a generally accepted custom and practice to recommend that a tower scaffold should not be moved with anyone on it; and that according to the advertising folders described they should be supplied with horizontal bars or braces for support. The advertising folders were offered and received in evidence in support of this testimony. However, since Mr. Hamm testified that he was aware of and familiar with such safety practices and recommendations, it would follow that any information or statements in these exhibits related to evidence otherwise admitted to be true by this defendant. Under such circumstances, there would be no prejudicial error in the admission of such exhibits. 14 Dunnell, Dig. (3 ed.) §§ 7184, 7187; see, also, Pleason Realty & Investment Co. v. Kleinman, 165 Minn. 342, 206 N. W. 645.

■ Defendant scaffold company contends that the trial court erred in rejecting an indemnity agreement set forth on the reverse side of its delivery receipt form, which provided that the college would indemnify it from all liability arising out of the renting of the scaffold. The trial court concluded that Olson, who signed the receipt, was without authority to bind the college on such an agreement. Mr. Hatfield testified that he had authority to rent such equipment as was needed. The receipt was signed, "Douglas Hatfield by N. Olson." This defendant was aware that Olson was acting only as custodian or caretaker of the fieldhouse. There is no showing that Hatfield had ever authorized Olson to execute an indemnity contract binding upon the college. Had this defendant wished to make such a contract effective, it is obvious that his first duty would be to procure its execution by an authorized agent of the college. He must have been aware that the latter would not have authorized its building custodian to bind it upon anything so important. He made no effort to seek Hatfield or to obtain his signature on

the indemnity agreement. The receipt on its face made no reference whatever to indemnity. The custodian was not asked or required to read or sign the agreement on the reverse side. In Mooney v. Jones, 238 Minn. 1, 9, 54 N. W. (2d) 763, 767, it was stated:

"* * * 'Every person * * * who undertakes to deal with an alleged agent, is put upon inquiry, and must discover at his peril that such pretended agent has authority * * * sufficient to permit him to do the proposed act, * * *.' "

It seems clear that in signing the receipt for the equipment the custodian did nothing more nor less than he was asked to do—acknowledge that the sectional scaffold had been delivered by the scaffold company to his care. In 6 Am. Jur., Bailments, § 179, it is stated:

"* * * the trend of the more recent authorities is to the view that receipt from the bailee at the time of the bailment of what is ostensibly a token for later identification of the bailed property does not bind the bailor as to provisions, purportedly limiting the bailee's liability, which are printed thereon, wherein his attention is not called to them and he has no actual knowledge at the time of the bailment that they are supposed to become part of the contract."

This view would seem applicable where the bailor delivers the indemnity agreement to the bailee. The college should not be held bound on an indemnity agreement absolving the scaffold company as bailor from all liability arising from the use of the scaffold, whether due to the bailor's negligence or otherwise, merely by virtue of the signature of its building custodian on a delivery receipt. This is particularly true where the agreement was never called to the attention of or executed by its representatives.

Affirmed.

Mr. Justice Otis, having presided at the pretrial conference, took no part.

Mr. Justice Rogosheske, not having been a member of the court at the time of the argument and submission, took no part in the consideration or decision of this case.