Thomas M. JOHNSON, Appellant,

Anita Johnson, Plaintiff,

v.

**FARMERS UNION CENTRAL EXCHANGE, INC.,
Respondent.**

No. C7–87–813, C4–87–431.

Court of Appeals of Minnesota.

Oct. 20, 1987.

Review Denied Nov. 24, 1987.

 
 

 
 
 
 
 
 

 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 

 
 
 
 
 
 
 
 
 
 
 
 
 

Galen J. Vaa, Gjevre, McLarnan, Hannaher, Vaa, Skatvold & McLarnan, Moorhead, for appellant.

Steven J. Cahill, Cahill and Maring, P.A., Moorhead, for respondent.

Hubert H. Humphrey, III, Atty. Gen., P. Kenneth Kohnstamm, Sp. Asst. Atty. Gen., St. Paul, for amicus curiae.

Heard, considered and decided by SEDGWICK, P.J., and PARKER and HUSPENI, JJ.

## OPINION

SEDGWICK, Judge.

The trial court reduced Thomas Johnson's damage award according to the discounting and collateral source provisions of the Tort Reform Act of 1986 (the "Act"). He appeals on numerous grounds, including a challenge to the constitutionality of the Act. We affirm.

## FACTS

Johnson was injured while working for the Community Co-op of Lake Park in October 1979. Johnson was attempting to relieve pressure on some anhydrous ammonia lines so that a pump could be repaired. He was wearing protective eye goggles on his forehead, rather than over his eyes. When he opened a valve, a burst of liquid ammonia from a nearby hose struck him in the face and chest, causing blindness in one eye and other injuries.

Johnson began this tort suit against Cenex in September 1983, alleging Cenex was negligent in designing, installing and maintaining the anhydrous ammonia facility, and in failing to provide adequate training on the procedure for operating the facility. A jury found Cenex to be 35% at fault and Johnson 15% at fault (excluding his failure to wear goggles). (The Co-op, not a party, was held 50% at fault). It found Johnson had incurred $132,811.63 in past damages. It awarded future damages as follows:

Future pain, discomfort, disability & disfigurement ...................$100,000
Future embarrassment and emotional distress ...................... $50,000

The jury further found that $58,000 of Johnson's past and future damages are attributable to his failure to wear protective eye goggles.

The trial court adjusted the award according to the provisions of the Act, 1986 Minn.Laws ch. 455.

First, it discounted the award of future damages to present value, as required by Minn.Stat. § 604.07 (1986). Since the jury did not apportion the $58,000 attributable to Johnson's failure to wear goggles between past and future damages, the trial court had to apportion those damages so that it could determine the net amount of future damages subject to discounting. The trial court apportioned the $58,000 based on the ratio of total future damages to total past damages as found by the jury: 47%, or $27,260, were attributed to past damages, and 53%, or $30,740, were attributed to future damages.

The net future and past damages were further reduced by 15% for Johnson's comparative negligence, resulting in a past damage award of $89,718.88, and a future damage award of $101,371. The court then discounted the future damages to present value by applying a discount rate of 4.5% for a period of 21 years, resulting in a net future damages award of $67,619.28.

Second, the court reduced the past damages award by the amount of workers' compensation benefits paid Johnson, as required by the "collateral source" statute, Minn.Stat. § 548.36 (1986). The court found he had received $79,167.15 in such benefits, and that the workers' compensation insurer had waived its subrogation right to those benefits. *See* Minn.Stat. § 548.36, subd. 2(1). It determined Johnson's net past damages award to be $10,-551.73.

Johnson appeals from the judgment and the order denying him a new trial. The state has filed an amicus curiae brief in support of the constitutionality of the Act. Although Cenex filed a notice of review, it has abandoned its challenge and requests us to affirm the judgment.

## ISSUES

1. Does Minn.Stat. § 604.07 (1986) require the discounting of future damages to be computed by the court or by the jury?

2. Is the discount statute unconstitutionally vague?

3. Does the discount statute violate appellant's constitutional rights to due process, equal protection, a certain remedy or a jury trial?

4. Did the trial court deprive appellant of his right to a jury trial by making findings of fact on issues not submitted to the jury?

5. May the discount and collateral source statutes be applied retroactively to this case?

6. Did the trial court err by admitting evidence of appellant's failure to wear protective goggles?

## ANALYSIS

### I.

Johnson first contends that under Minn.Stat. § 604.07, the discounting should have been performed by the jury, not the court. The supreme court has since held that the discounting must be computed by the court. *Bianchi v. Nordby*, 409 N.W.2d 835 (Minn.1987). The constitutionality of the statute, however, was not before the supreme court. *Id.* at 839.

### II.

The discount statute provides that in all personal injury actions, awards of future damages must be discounted to present value:

> In all actions seeking damages for personal injury, wrongful death, or loss of means of support, awards of all future damages, including economic, noneconomic and intangible loss, reasonably certain to occur must be discounted to present value as provided in this section.

Minn.Stat. § 604.07, subd. 2 (1986).

Johnson attacks the constitutionality of the discount statute on various grounds. Statutes are presumed constitutional. *Wegan v. Village of Lexington*, 309 N.W.2d 273, 279 (Minn.1981). The challenging party must show the statute is unconstitutional "beyond a reasonable doubt". *Id.* A court will declare a statute unconstitutional "only when absolutely necessary, and then with extreme caution." *Id.*

### A. *Vagueness.*

Much of Johnson's constitutional attack on the discount statute is based on the way the discount rate is determined. The statute provides the following formula for determining the appropriate discount rate:

> *Discount rate.* The award * * * must be reduced to present value at the time of trial by application of a discount rate equal to:
>
> (1) the average rate of interest on judgments under section 549.09 for the five calendar years immediately preced-

ing the commencement of trial * * *, less

(2) the average increase in the Consumer Price Index [CPI] for all Urban Consumers, all items, as published by the United States Department of Labor, Bureau of Labor Statistics, * * *, for the same five-year period. If the Labor Department statistics are not published by the time of trial, the court shall employ the average increase over the most recent five-year period available in the published statistics.

In no instance may the discount rate fall below two percent or rise above six percent.

Minn.Stat. § 604.07, subd. 4 (1986).

The state court administrator is required by statute to determine the interest rate. Minn.Stat. § 549.09, subd. 1(c) (1986). Although not statutorily required to do so, the state court administrator has also been computing the inflation rate (thus providing the discount rate: interest rate minus inflation rate). *See* Minn.Stat.Ann. § 604.07 (West Supp.1987).

One difficulty in computing the discount rate is that the U.S. Department of Labor does not compute the annual CPI statistics until several weeks into the new year. Until those statistics are published, the statute requires the use of the CPI statistics for the most recent five-year period. § 604.07, subd. 4(2). In the weeks before the new CPI statistics are published, therefore, the discount rate is based on the new interest rate (which is determined by December 20 of the previous year), and last year's inflation rate. When the new CPI statistics come out, the discount rate is adjusted so that the inflation and interest rates are both based on the same five calendar-year period.

For example, for trials commenced in 1986, such as in this case, the discount rate was 4.5% (10% interest rate minus 5.5% inflation rate). On January 1, 1987, the state court administrator announced the discount rate for trials commenced in 1987 to be 3.5%, apparently based on the new interest rate and the old inflation rate. Effective January 21, 1987, the administrator announced the discount rate to be 5.2%, presumably based on newly-published CPI statistics.

Johnson argues this fluctuation in the discount rate makes the statute unconstitutionally vague. In the civil context,

legislation otherwise valid will not be judicially declared null and void on the ground that the same is unintelligible and meaningless unless it is so imperfect and so deficient in its details as to render it impossible of execution and enforcement, and is susceptible of no reasonable construction that will support and give it effect, and the court finds itself unable to define the purpose and intent of the legislature.

*Invention Marketing, Inc. v. Spannaus,* 279 N.W.2d 74, 80 (Minn.1979).

■ The January fluctuation does not make the statute vague, as that term is defined in *Spannaus.* The statute is very precise as to how to determine the discount rate.

Johnson also cites motion papers in an unresolved district court case in which the defendant's economist disagreed with the administrator's determination of the discount rate. He argues that where competent economists can disagree on the interest rate, the statutory provisions must be vague and unworkable. This argument is a non sequitur. Also, Cenex correctly argues that the motion papers are outside the record.

### B. *Certain remedy.*

Johnson argues the discount rate fluctuations makes the statute a violation of the certain remedy clause of the Minnesota Constitution, which provides:

Every person is entitled to a certain remedy in the laws for all injuries or wrongs which he may receive to his person * * *, and to obtain justice * * * completely and without denial * * *, conformable to the laws.

Minn. Const. art. 1, § 8.

Johnson relies on *Haugen v. Town of Waltham,* 292 N.W.2d 737 (Minn.1980), in which the court held unconstitutional under

the certain remedy clause a provision of the automobile no-fault act requiring the deduction from a tort judgment the amount of economic loss benefits payable in the future. The court reasoned:

> The statute is silent as to how future loss benefits to be payable in the future may be determined with any reasonable degree of accuracy. * * * [T]he plaintiff has no assurance that his insurance carrier will accept the amount of damages awarded, let alone that it will accept responsibility for such damages. If the no-fault carrier contests these matters, then the successful plaintiff must relitigate his claim under the arbitration provisions of his policy. * * * [T]he successful litigant obtains an incomplete remedy which lacks certainty. * * *
>
> Thus, we conclude that * * * the lack of feasible, constitutionally permissible legislative enactments establishing guidelines for the effective administration of the proposed deduction preclude the courts from the literal enforcement of the statute. Further, the lack of guidelines makes the application of the deduction inequitable and unjust upon successful litigants.

*Id.* at 740.

■ *Haugen* is distinguishable. There the statute was held unconstitutional because it required the deduction of loss benefits payable in the future, without stating how to determine whether loss benefits would be paid. Here, the statute provides a detailed method of discounting.

Johnson also argues that the discount statute violates the certain remedy clause under *Haugen* because it provides only the discount rate and none of the other factors needed to discount to present value. The statute does not state how to determine the amount of time over which the damages will be incurred, or how often over that period of time they will be incurred (*e.g.*, whether to discount on an annuity or lump-sum basis). Johnson argues this has led to uncertainty as to how trial court's apply the statute, with some leaving it to the jury to determine whether the damages should be discounted on a lump-sum basis.

The other factors are issues of fact that can be determined by the jury. The special verdict form requires the jury to determine the amount of future damages and the number of years over which they will occur. 4 Minnesota Practice, CIV JIG III, Special Verdict Form No. 8 (1986). Ordinarily, the discounting is done on an annuity basis, but a plaintiff can request a special interrogatory on when the future damages would be incurred, if there is evidence they will be incurred unevenly (for example, an expensive operation will be needed in 10 years).

The need to make findings of fact does not make discounting under the statute unconstitutionally vague or uncertain. As Cenex points out, the uncertainty present in discounting is inherent in predicting the future.

Johnson argues that requiring noneconomic and intangible losses to be discounted is unconstitutional, because they were not discounted at common law. Since he does not specify any constitutional provision in support of this argument, we will not address it. *See Swigerd v. City of Ortonville*, 246 Minn. 339, 341, 75 N.W.2d 217, 219 (1956).

Johnson also claims that the statute calls for an arbitrarily high discount rate, because the interest rate is based on the statutory interest rate on judgments, which can never go below 8%. Minn.Stat. § 549.09, subd. 1(c) (1986). He also argues the discount rates should be based on longer than a five-year period. This allegedly violates his right to a certain remedy, due process and a jury trial. Since he does not support his jury trial claim with argument or citation to authority, we will only address the other two claims. *See Swigerd*, 246 Minn. at 341, 75 N.W.2d at 219.

■ The certain remedy clause does not prohibit the legislature from requiring the use of a discount rate that is artificially high. Under the certain remedy clause, the legislature may constitutionally abrogate a common-law right if it is pursuing a permissible legislative objective. *Tri-State Insurance Co. v. Bouma*, 306 N.W.2d 564,

566 (Minn.1981). Here, the legislature is attempting to lower rates for tort liability insurance. *See generally* Note, *Introduction to Minnesota's Tort Reform Act,* 13 Wm. Mitchell L.Rev. 277 (1987). This is a permissible objective.

### C. *Due Process and Equal Protection.*

Johnson contends the statute's artificially high discount rate violates the due process clause. (He never argues that the 1986 rate applied to him, 4.5%, is unreasonably high.) He also argues the statute violates equal protection because it applies only to personal injury cases, and not to other torts, such as those involving damage to property.

■ Unless a fundamental right is limited or a classification is based on a suspect class, minimal judicial scrutiny of legislation is appropriate. *Essling v. Markman,* 335 N.W.2d 237, 239 (Minn.1983). Personal injury plaintiffs are not a suspect class, and the right to recovery of tort damages is not fundamental. *Hoffman v. United States,* 767 F.2d 1431, 1435–36 (9th Cir. 1985); *see Bernthal v. City of St. Paul,* 376 N.W.2d 422 (Minn.1985). Under either equal protection or substantive due process analysis, therefore, the statute is constitutional if it is rationally related to achievement of a legitimate government purpose. *See Essling,* 335 N.W.2d at 239. Requiring future damages to be discounted to present value in personal injury actions is rationally related to the legitimate objective of reducing the cost of personal liability insurance.

Johnson argues the statute violates equal protection because there is no reasonable basis for distinguishing between personal injury torts and other types of torts. He cites a survey showing that average personal injury awards remained constant over 1981–85, and most civil cases involve commercial litigation. Cenex correctly points out that this material is outside the record, because it was never presented to the trial court.

Also, it is not within a court's province "to determine the wisdom of or necessity for a legislative enactment." *Moes v. City of St. Paul,* 402 N.W.2d 520, 525 (Minn. 1987). Johnson's argument essentially is that the discounting statute should apply to all tort actions or none. This is not constitutionally required. A legislature need not "strike at all evils at the same time." *Minnesota v. Clover Leaf Creamery Co.,* 449 U.S. 456, 466, 101 S.Ct. 715, 725, 66 L.Ed.2d 659 (1981)).

### III.

The trial court found that of the $58,000 attributable to Johnson's failure to wear goggles, 47% were past damages and 53% were future damages. It based this finding on the ratio of past to future damages as found by the jury as to Johnson's total damages. The trial court also found that Johnson's future damages would be incurred evenly over 21 years. Johnson contends the court denied him his right to a jury trial by making those findings.

■ The trial court needed findings on those facts in order to discount Johnson's future damages. Johnson did not request interrogatories on those issues, and he did not object to the verdict form which did not request the jury to make findings on those issues. He therefore waived his right to a jury trial on those issues. *See* Minn.R.Civ. P. 49.01; *Lemmer v. IDS Properties, Inc.,* 304 N.W.2d 864, 870 (Minn.1980). It was proper for the court to apportion the $58,-000 based on the total ratio of past to future damages.

### IV.

Both the collateral source statute and the discount statute apply to actions pending on their effective dates. 1986 Minn.Laws ch. 455, § 95. Johnson argues this retroactive application is unconstitutional.

In *Peterson v. City of Minneapolis,* 285 Minn. 282, 173 N.W.2d 353 (1969), the supreme court explained that retroactive statutes are constitutional as long as they do not interfere with *vested* rights. Such rights reflect "a determination that justice and equity require that the interest be preserved." *Id.* at 288, 173 N.W.2d at 357. The court acknowledged that determining

what rights are vested is difficult, and it offered three factors:

(1) The nature and strength of the public interest served by the statute;

(2) the extent to which the statute modifies or abrogates the right; and

(3) the nature of the right.

*Id.* The court held that a statute retroactively replacing contributory negligence with comparative negligence was constitutional:

[T]he legislature had the constitutional right to determine this question of policy and [the statute] did not affect a right which could be considered such a vested right as to prohibit constitutionally any change in it.

*Id.* at 290, 173 N.W.2d at 358.

### A. *Collateral source statute.*

The collateral source statute prevents double recovery by requiring the deduction of certain benefits received by a civil plaintiff, such as workers' compensation benefits, from a judgment. Minn.Stat. § 548.36 (1986). The statute, in effect, abrogates the common law right to be overcompensated for injuries. This right does not deserve to be considered vested under the considerations cited in *Peterson.*

Johnson argues that the collateral source statute deprives him of his right to have the verdict allocated under *Henning v. Wineman,* 306 N.W.2d 550 (Minn.1981). That case deals with allocation of damages between those recoverable under the workers' compensation statute and those not, for the purpose of determining an employer/insurer's subrogation interest only. Since the insurer waived its subrogation interest in this case, *Henning* is inapplicable.

We also reject Johnson's contention that the workers' compensation act's provisions for apportionment of third-party recovery make the collateral source statute inapplicable to workers' compensation benefits. The collateral source statute clearly was intended to apply to such benefits. Minn. Stat. § 548.36, subd. 1(1).

### B. *Discount statute.*

Johnson argues the discount statute abrogates his vested common law right not to have future noneconomic losses discounted. Such damages were not discounted at common law because courts believed it impracticable to require juries to do so. *See Ahlstrom v. Minneapolis, St. Paul & Sault Ste. Marie Railroad Co.,* 244 Minn. 1, 29 & n. 23, 68 N.W.2d 873, 891 & n. 23 (1955). The common law practice did not constitute a vested right on the part of plaintiffs to be overcompensated for such damages. Since the discount statute provides for discounting by the court according to a precise formula, much of the basis for the common law rule is no longer present.

### V.

Johnson argues the trial court erred in admitting evidence of his failure to wear goggles. The evidence was admitted only on the issue of mitigation of damages. The jury was asked whether Johnson was negligent in failing to wear protective eye goggles at the time of the accident, and if so, whether that negligence directly contributed to all or part of his eye injuries. The jury answered yes to both questions, and found that $58,000 of Johnson's damages was attributable to his failure to wear goggles.

Johnson contends it was error to admit evidence on this issue because (1) such evidence is inadmissible by analogy to cases excluding evidence of failure to wear motorcycle helmets or seatbelts, and (2) Cenex presented insufficient foundation testimony to allow a jury to conclude wearing goggles would have prevented injury.

In *Burgstahler v. Fox,* 290 Minn. 495, 496, 186 N.W.2d 182, 183 (1971), a negligence action arising out of a motorcycle accident, the court held it was proper to exclude evidence the plaintiff was not wearing a safety helmet, relying on the "rule adopted in *Rogers v. Frush,*" 257 Md. 233, 262 A.2d 549 (1970). (The legislature has since passed a statute making evidence of failure to wear protective headgear in motorcycle accident cases admissible on the

issue of damages. Minn.Stat. § 169.974, subd. 6 (1986).) In *Rogers,* the court held that evidence of plaintiff's failure to wear a motorcycle helmet was inadmissible on the issue of mitigation of damages.

The supreme court's adoption of the *Rogers'* rule rejecting the "helmet defense" is not controlling here. In both *Burgstahler* and *Rogers,* the evidence was excluded primarily because failure to wear a helmet did not violate a standard of care. In order for the doctrine of avoidable consequences to apply, the plaintiff's conduct must be negligent. In both cases, the courts based their decisions on the absence of any legal requirement to wear a helmet. The courts refused to allow a finding of negligence to be based on the failure to wear a helmet, because they did not want to impose such a standard of care. This rationale also underlies decisions in which courts have ruled inadmissible evidence of plaintiff's failure to wear a seatbelt. *See, e.g., Clarkson v. Wright,* 108 Ill.2d 129, 90 Ill.Dec. 950, 483 N.E.2d 268 (1985); *Amend v. Bell,* 89 Wash.2d 124, 570 P.2d 138 (1977).

Here, in contrast, there was ample basis for the jury to find that Johnson's failure to wear goggles was negligence. Johnson does not dispute Cenex's contention that OSHA regulations required that goggles be worn. A jury could find negligence even without such regulations. Johnson attended safety seminars and read manuals which stressed the importance of wearing goggles when working with ammonia, and he testified, "It was written all over the place." When asked if his supervisors reminded him from time to time to wear goggles, he testified, "I think it was just assumed we were smart enough to do that." There was also testimony that Johnson conceded he had "screwed up," because his supervisor was "giving him hell" to put on his goggles and he was reaching to pull them down over his eyes when the accident occurred. The clear evidence of Johnson's negligence distinguishes this case from the helmet and seatbelt cases he relies on.

Johnson argues that, under the circumstances of this case, evidence of his failure to wear goggles should only have been admitted if Cenex produced expert testimony that the goggles were constructed in accordance with regulatory standards, that they would not have been knocked off his face by the blast of ammonia, and that they would have prevented injury. Without such testimony, Johnson argues, the jury was required to speculate as to whether his failure to wear the goggles caused any of his injury.

Johnson's opthalmologist testified that if he had had this on his eye and it hadn't been blown off by the force of the ammonia he would not have injured his eyes. It's unlikely he would have had either the injury he had or at least the amount of injury he had.

We believe this testimony provided sufficient foundation for admission of evidence of Johnson's failure to wear goggles. Whether the goggles would have been knocked off his head, had he been wearing them properly, is an issue of fact that the jury could decide. We do not hold, moreover, that such expert testimony is always required. *See Northway v. Madsen,* 390 N.W.2d 435, 437 (Minn.Ct.App.1986) (rejecting contention that expert testimony required for jury to reduce damages for head injuries that could have been avoided by wearing a motorcycle helmet).

## DECISION

Affirmed.