**REINSURANCE ASSOCIATION OF MINNESOTA, Appellant,**

v.

**DUNBAR KAPPLE, INC., Respondent.**

**No. C2-89-464.**

Court of Appeals of Minnesota.

Aug. 1, 1989.

Thomas M. Kilbury, Larry J. Peterson & Associates, St. Paul, for appellant.

Katherine L. MacKinnon, Arthur, Chapman & McDonough, P.A., Minneapolis,

Hugh C. Griffin, Lord, Bissell & Brook, Chicago, Ill., for respondent.

Heard, considered and decided by NORTON, P.J., and RANDALL and MULALLY,* JJ.

## OPINION

### EDWARD D. MULALLY, Judge.

Reinsurance Association of Minnesota (RAM) brought this action against respondent Dunbar Kapple, Inc., an Illinois corporation, seeking contribution and indemnity for amounts RAM had paid to an injured employee pursuant to RAM's workers' compensation liability policy insuring the employer. RAM alleged Dunbar Kapple had negligently designed and manufactured the machinery upon which the employee was injured. Because Dunbar Kapple's liability insurer was insolvent at the time of the action, the trial court entered summary judgment dismissing RAM's claim pursuant to Illinois and Minnesota statutes providing that a subrogee insurer can assert no claim for indemnity or contribution against a person whose liability insurer is insolvent. RAM appeals that summary judgment. We affirm.

## FACTS

On or about July 15, 1983, Richard Bishop, employee of Leon Streiff, sustained personal injuries in the course of his employment when his hand became entangled in a piece of machinery known as a "DK VAC-U-VATOR" grain moving machine, designed and manufactured by respondent Dunbar Kapple. Bishop claimed workers' compensation benefits and his employer turned that claim over to its workers' compensation insurer, appellant RAM. RAM subsequently paid the claim for wage loss, medical benefits and permanent disability in an amount exceeding $50,000.

Alleging Dunbar Kapple negligently designed and manufactured the VAC-U-VATOR, RAM, as subrogee of the employer's rights, commenced this action for contribution and indemnity against Dunbar Kapple.

Prior to commencement of this action, however, Dunbar Kapple's liability insurer, Midland Insurance Company, an Illinois corporation, had become insolvent and had been placed into liquidation with the New York Liquidation Bureau.

Dunbar Kapple subsequently moved for summary judgment, arguing that pursuant to similar Minnesota and Illinois statutes, a subrogee insurer may not bring a claim for contribution, indemnity or otherwise against a person insured under a policy issued by an insolvent company. *See* Ill. Ann.Stat. Ch. 73, § 1065.84–3(b)(v) (Smith–Hurd 1989 Supp.); Minn.Stat. § 60C.09, subd. 2(2) (1988). RAM opposed the motion, arguing that Illinois law did not apply and that the current Minnesota law, enacted in 1988 after this action was commenced, also could not be applied because to do so would unconstitutionally impair RAM's vested rights. RAM thus claimed that the applicable law was that in effect on July 15, 1983, Minn.Stat. § 60C.09 (Supp.1983), and that this 1983 statute did not bar RAM's indemnity and contribution claims. The trial court granted Dunbar Kapple's summary judgment motion and this appeal followed. Dunbar Kapple claims the trial court may be affirmed for any of the following reasons: (1) the 1983 Minnesota law bars RAM's action; (2) even if the 1983 law does not bar the action, the 1988 amendment can be constitutionally applied to bar the action; and (3) in any event, under conflicts of law principles, Illinois law, which clearly would bar the action, should be applied.

## ISSUES

1. Does Minnesota law in effect on July 15, 1983 bar a subrogee insurer's claims for indemnity and contribution against the insured of an insolvent insurer?

2. May the 1988 amendment to Minn. Stat. § 60C.09, subd. 2 be applied retroactively to govern actions accruing prior to the amendment?

* Acting as judge of the Court of Appeals by appointment pursuant to Minn. Const. art. VI, § 2.

## ANALYSIS

Both Minnesota and Illinois, along with a majority of states, have created insurance guaranty organizations, comprised of and funded by insurers licensed to do business in each state. The nature and purpose of these organizations is concisely explained in Annot., 30 A.L.R.4th 1110, 1113–14 (1984):

In an attempt to protect policyholders and those with claims against policyholders from the consequences of the insolvency of an insurance company, many states have passed laws establishing an organization, the sole purpose of which is to compensate those who have claims against an insurance company which have not been paid because the company is insolvent. Such organizations are commonly referred to as insurance guaranty associations.

The activities of insurance guaranty associations are usually funded by its members. Generally, all insurance companies doing business within a state will be required to belong to the association * * * and will be assessed some sort of fee. In this way, the burdens created by the insolvency of an insurer are spread over all member insurance companies, and through them, all policyholders. Thus, insurance guaranty associations have been said to provide insolvency insurance for insurance companies.

(Footnote omitted.) This explanation accurately describes both the Minnesota and Illinois organizations.

The Illinois organization, known as the Illinois Insurance Guaranty Fund (Illinois fund), was created in 1937. *See* 1937 Ill. Laws p. 696, § 532. The organization's purposes are

to provide a mechanism for the payment of covered claims under certain insurance policies, to avoid excessive delay in payment, to avoid financial loss to claimants or policyholders because of the entry of an order of liquidation against an insolvent company and to provide a fund

to assess the cost of such protection among member companies.

Ill.Ann.Stat. ch. 73, § 1065.82 (Smith–Hurd 1989).

The Minnesota organization, known as the Minnesota Insurance Guaranty Association (Minnesota association), was created in 1971. *See* 1971 Minn.Laws ch. 145. Its stated purposes are

to provide a mechanism for the payment of covered claims under certain insurance policies and surety bonds, to avoid excessive delay in payment and to avoid financial loss to claimants or policyholders because of the liquidation of an insurer, to assist in the detection and prevention of insurer insolvencies, and to provide an association to assess the cost of the protection among insurers.

Minn.Stat. § 60C.02, subd. 2 (1988).

There can be no serious dispute that under the current law in both Illinois and Minnesota, RAM's claim for indemnity or contribution against Dunbar Kapple is barred. The applicable Illinois statute, Ill. Ann.Stat. ch. 73, § 1065.84–3(b)(v), provides, in pertinent part:

(b) "Covered claim" does not include:

\* \* \* \* \* \*

(v) any claim for any amount due any reinsurer, insurer, insurance pool, or underwriting association as subrogated recoveries, reinsurance recoverables, contribution, indemnification or otherwise. *No such claim held by a reinsurer, insurer, insurance pool, or underwriting association may be asserted in any legal action against a person insured under a policy issued by an insolvent company* other than to the extent such claim exceeds the Fund obligation limitations set forth in [section 1065.87–2].[1]

(Emphasis added.) Thus, the statute not only prevents a subrogee insurer from making a claim upon the Illinois fund, it also prevents that insurer from suing the insured of an insolvent company.

---

**1.** In this case, neither party asserts that the claim would exceed the fund obligations set forth in section 1065.87–2. For purposes of this

action, it appears the fund obligation is the same as the face amount of the policy issued by Midland, the insolvent insurer.

Similarly, the applicable Minnesota statute, Minn.Stat. § 60C.09, subd. 2 (1988), provides in pertinent part

a covered claim does not include:

\* \* \* \* \* \*

(2) claims due a reinsurer, insurer, insurance pool, or underwriting association, as subrogation recoveries or otherwise. This clause does not prevent a person from presenting the excluded claim to the insolvent insurer or its liquidator, *but the claims shall not be asserted against another person, including the person to whom the benefits were paid or the insured of the insolvent insurer,* except to the extent that the claim is outside the coverage of the policy issued by the insolvent insurer.[2]

(Emphasis added.) Consequently, Minnesota law likewise prevents a subrogee insurer from claiming against the Minnesota association and also prevents a subrogee insurer from suing the insured of an insolvent insurer on an indemnity and contribution claim. Unlike the Illinois law, however, the Minnesota law expressly allows the insurer to make a claim directly against the insolvent insurer itself or the insolvent insurer's liquidator.

Prior to 1988, Minn.Stat. § 60C.09 did not contain language expressly barring subrogee insurers from asserting indemnity and contribution claims against the insured of the insolvent insurer. This language, as quoted above, was added by 1988 Minn. Laws ch. 541, § 8. This portion of the 1988 amendment was made applicable to "all unsettled current or existing and future claims paid after [April 19, 1988] arising out of any past or future member insolvency." 1988 Minn.Laws ch. 541, § 15. RAM argues the 1983 statute must apply and that, under the 1983 statute, RAM's claims are not barred. We disagree for two reasons: first, the 1983 statute can be construed to prohibit indemnity and contribution claims by subrogated insurers against the insureds of insolvent insurers; and secondly, retroactive application of the 1988

amendment does not impair vested rights so as to be unconstitutional.

■ 1. The Minnesota law in effect at the time of the accident, July 15, 1983, was Minn.Stat. § 60C.09, subd. 1 (Supp.1983). (The 1983 amendment to this subdivision was effective May 21, 1983. *See* 1983 Minn.Laws ch. 203, § 5.) Pursuant to the 1983 law, a "covered claim" was one made by:

(i) A policyholder, or an insured beneficiary under a policy \* \* \*; or

\* \* \* \* \* \*

(iv) A third party claimant under a liability policy or surety bond \* \* \*; or

(v) A direct or indirect assignee of a person who except for the assignment might have claimed under (i), (ii) or (iii).

Minn.Stat. § 60C.09, subd. 1(c) (Supp.1983). In this case, a claim against the Minnesota association could have been made by Midland's policyholder, Dunbar Kapple, pursuant to subparagraph (i). In addition, a claim against the association could have been made by the third-party claimant under a liability policy, pursuant to subparagraph (iv). The third-party claimant in this case would have been the employer, Leon Streiff. RAM is neither the policyholder nor the third-party claimant under Midland's policy. Rather, RAM is the subrogee, or assignee, of the third-party claimant. Pursuant to subparagraph (v) of the 1983 statute, the only assignees which could make claims against the Minnesota association were those assignees of persons listed in subparagraphs (i), (ii) and (iii). The statute does not allow an assignee of the third-party claimant, referenced in subparagraph (iv), to make claims against the association. Consequently, RAM could not have made a claim against the association under the 1983 law.

Given that the statute prevents RAM from making a claim against the association, it is reasonable to conclude the legislature also would have wanted to prevent RAM from going directly after the insured,

---

**2.** As noted above, neither party asserts the claim in this case is outside coverage of Midland's liability policy to Dunbar Kapple.

who is supposed to be protected by the association. As set forth in the statement of purpose, the association was created to protect claimants and policyholders, and to assess the cost of that protection among insurers. Minn.Stat. § 60C.02, subd. 2 (1988).[3] It was not created to protect or benefit insurers.

The notion that subrogated insurers should not be allowed to sue the insured of insolvent insurers has been articulated by courts in several jurisdictions. We briefly discuss two significant cases below.

In *Sandson's Bakery v. Glover*, 162 N.J. Super. 225, 226, 392 A.2d 640, 641 (1978), the court construed the New Jersey statute, which provided that " 'covered claim' shall not include any amount due any reinsurer, insurer, insurance pool or underwriting association * * *." Although the court noted that the statute did not specifically prohibit subrogee insurers from suing the insured of an insolvent insurer, it nonetheless held that subrogation actions themselves were barred, stating:

It is clear that the intention of the legislature, when enacting this act, was to provide protection from insolvent insurers not only to innocent injured third parties * * *, but also to those insured by an insurer that becomes insolvent.

162 N.J.Super. at 227, 392 A.2d at 641. The court then recited the stated purpose of the New Jersey statute, which purpose is essentially the same as the stated purposes of both the Minnesota and Illinois statutes.

More recently, in *Fireman's Fund Insurance Co. of Wisconsin v. Pitco Frialator Co., Inc.*, 145 Wis.2d 526, 427 N.W.2d 417 (Wis.Ct.App.1988), *review denied*, 146 Wis.2d 875, 430 N.W.2d 918 (1988), the Wisconsin Court of Appeals construed a Wisconsin statute which provided that a claim may be paid by the association only if the claim is "the claim of a direct or indirect assignee, other than an insurer * * *." *Id.* at 532 n. 2, 427 N.W.2d at 420 n. 2. The Wisconsin court expressly followed *Sandson's Bakery*, stating that, even though the

statute did not expressly prohibit subrogee insurers from suing the insured of insolvent insurers, to allow such actions would circumvent the basic purpose of the statute which is to protect the insured of an insolvent insurer. 145 Wis.2d at 532, 427 N.W.2d at 420.

RAM attempts to distinguish these cases on the basis that they did not involve a workers' compensation subrogation claim, which claim is expressly recognized by Minnesota statute. This attempt to distinguish is not persuasive because, in this case, as in *Sandson's Bakery* and *Pitco*, the subrogee insurer is still attempting to get from the insured of the insolvent insurer what it could not get from the association, and in both cases the insured of the insolvent insurer is the party at risk.

■ RAM also argues that the applicable 1983 workers' compensation law supersedes anything to the contrary in Chapter 60C. RAM relies on Minn.Stat. § 176.061, subd. 10 (Supp.1983), which states:

Notwithstanding the provisions of Chapter 65B or any other law to the contrary, an employer has a right of indemnity for any compensation paid or payable pursuant to this chapter * * *.

Minn.Stat. § 60C.02, subd. 1 (Supp.1983), does not conflict with the workers' compensation law because it addresses only the subrogee insurer's right of indemnity and does not so limit the employer itself from asserting its right of indemnity.

Secondly, even if there were a conflict, in reconciling Minn.Stat. §§ 60C.09, subd. 1 and 176.061, subd. 10 (Supp.1983), we would apply the former's provisions in this case because to do so would better effectuate legislative intent. *See* Minn.Stat. § 645.16 (1988). The primary intent of the Minnesota workers' compensation law is to "assure the quick and efficient delivery of indemnity and medical benefits to *injured workers* at a reasonable cost to the *employers* who are subject to the provisions of this chapter." Minn.Stat. § 176.001 (1988) (emphasis added). Thus, as in Chap-

---

**3.** The statement of purpose in the 1988 statute is identical to that in effect at the time of the

accident. *See* Minn.Stat. § 60C.02, subd. 2 (1982).

ter 60C, the persons to be protected by the workers' compensation law are the injured claimants (employees) and policyholders (employers), not the insurers. Given any ambiguity concerning the rights as between the injured claimant and the policyholder on the one hand, and the insurer on the other, we believe the legislature intended to tip the balance in favor of the claimants (employees) and policyholders (employers) in a situation such as this. Consequently, we hold Minn.Stat. § 60C.02, subd. 1 (Supp.1983), if applied, would bar RAM's action for indemnity and contribution.

### Constitutionality of Retroactive Application of 1988 Amendment

■ 2. Even assuming RAM would have a cause of action against Dunbar Kapple under the 1983 Minnesota law, we believe the retroactive application of the 1988 amendment is constitutionally permissible because it does not deprive RAM of any vested rights which it had under the previous law.

RAM asserts that retroactive application is an impairment of the obligation of contracts. Although the distinction is not crucial in this case, it is not RAM's contract rights which have been impaired. RAM's cause of action for indemnity and contribution against the tortfeasor is a right which existed as a matter of equity. *See Olson v. Village of Babbitt,* 291 Minn. 105, 111, 189 N.W.2d 701, 706 (1971). Equitable rights of contribution and indemnity have now been codified in various portions of the Minnesota statutes. In particular, rights to contribution and indemnity against a tortfeasor are set forth in the workers' compensation laws, Minn.Stat. § 176.061, subd. 10 (1988), and in the comparative fault statute, Minn.Stat. § 604.01 (1988). Therefore, RAM's rights to recover damages are those created by equity or by statute, and are not contract rights. The question in this case then is whether RAM was deprived of equitable or statutory rights by subsequent legislation, thus working a denial of due process of law in violation of Minn. Const. art. I, § 8.

The Minnesota Supreme Court explained that the term "vested interest," as used in the constitutional sense, reflects a determination that justice and equity require that the interest be preserved. *Peterson v. City of Minneapolis,* 285 Minn. 282, 288, 173 N.W.2d 353, 357 (1969) (quoting *Halverson v. Rolvaag,* 274 Minn. 273, 275, 143 N.W.2d 239, 241 (1966)). The *Peterson* court articulated three factors to consider in determining whether the interest is vested and thus may not be impaired by a subsequent statutory amendment:

1. The nature and strength of the public interest served by the statute;

2. The extent to which the statute modifies or abrogates the preenactment right; and

3. The nature of the right the statute alters.

*Id.*

In this case, there is a strong public interest furthered by the 1988 amendment. Specifically, it is designed to implement the policy of Chapter 60C, which is to protect claimants and policyholders from losses due to an insurer's insolvency, a circumstance entirely out of the control of policyholders or claimants. As noted above, another purpose of Chapter 60C is to allocate the costs of protecting policyholders and claimants among the insurers licensed to do business in the state. By preventing subrogee insurers from suing insureds of insolvent insurers, the 1988 amendment essentially provides another mechanism of allocating costs among the insurers. It would seem illogical to require insurers to contribute to a fund designed to protect policyholders and claimants, then allow various insurers to draw upon the fund or to directly sue the policyholders and claimants whom the fund is designed to benefit.

As to the second factor, the 1988 amendment does not substantially modify or abrogate insurers' subrogation rights of indemnity and contribution. The statute only applies in limited situations where the alleged tortfeasor's insurer is insolvent. Furthermore, it only prevents the subrogee insurer from suing within the policy limits of the policy issued by the insolvent insur-

er. The subrogee insurer may still sue the insured for liability in excess of the policy amount or outside the scope of coverage. In addition, the subrogee insurer may directly sue the insolvent insurer, although such suit is unlikely to produce any significant recovery.

As to the third factor, we do acknowledge that rights of indemnity and contribution are significant longstanding rights derived from traditional principles of equity. After weighing the three factors, however, we believe RAM's cause of action against Dunbar Kapple is not such a vested right that it cannot be impaired by subsequent legislation. At this point, RAM's cause of action is merely a contingent right, one that could be reduced to a vested right only after litigation against Dunbar Kapple and sufficient proof, as determined by the trier of fact, to establish that Dunbar Kapple was in fact negligent in its design and manufacture of the product and that such negligence was the proximate cause of the employee's injury. We are particularly persuaded by the reasoning in *Peterson* and in *Benson v. Farmers Union Central Exchange, Inc.*, 414 N.W.2d 425 (Minn.Ct. App.1987), *pet. for rev. denied* (Minn. Nov.

24, 1987), where the courts found that the legislature, as a matter of public policy, could enact retroactive legislation affecting various rights of recovery in pending personal injury actions.

Because we determine that RAM's action is barred under either Minnesota or Illinois law, we do not address the issue of which state's law should apply under a conflicts analysis. *See Pitco*, 145 Wis.2d at 532–33, 427 N.W.2d at 420 (no need to address which state's law applies where there is no conflict).

## DECISION

The trial court correctly ruled that under either Minnesota or Illinois law, RAM's action for indemnity and contribution against Dunbar Kapple, the insured of an insolvent insurer, is barred.

Affirmed.