Steven L. IMLAY, et al., Appellants,

v.

CITY OF LAKE CRYSTAL, d/b/a Lake Crystal Municipal Liquor Store, et al., Defendants and Third-Party Plaintiffs, Respondents,

v.

Vicki CARVER, Administrator of the Estate of Virgil H. Miller, Deceased, Third–Party Defendant.

No. CX–88–2551.

Court of Appeals of Minnesota.

Aug. 22, 1989.

Review Granted Oct. 25, 1989.

David J. Moskal, Mary C. Cade, Schwebel, Goetz & Sieben, P.A., Minneapolis, John M. Riedy, McLean, Peterson Law Firm, Mankato, for appellants.

Katherine L. MacKinnon, Lindsay G. Arthur, Jr., Arthur, Chapman, & McDonough, P.A., Minneapolis, for respondents.

Hubert H. Humphrey, III, Atty. Gen., P. Kenneth Kohnstamm, Asst. Atty. Gen., St. Paul, for respondent/intervenor State of Minn.

Heard, considered, and decided by LANSING, P.J., and FOLEY and THOREEN, JJ.

## OPINION

JOHN F. THOREEN, Judge.

Appellants Steven and Theresa Imlay commenced a lawsuit against respondents City of Lake Crystal and City of Lake Crystal d/b/a Lake Crystal Municipal Liquor Store under Minn.Stat. § 340A.801 (1988). The city subsequently filed a third-party action against Virgil Miller's estate. The trial court later reduced the jury's verdict pursuant to Minn.Stat. § 604.02, subd. 1 (1986).

The Imlays appeal from the judgment, raising various constitutional issues and contending the trial court improperly deducted collateral sources, incorrectly calculated interest and improperly found the city did not waive municipal immunity. The city noted review, arguing the trial court erred in its calculation of pre-verdict interest and in admitting results of blood alcohol tests performed on Miller.

## FACTS

On June 16, 1984, appellants, who were riding a motorcycle, were struck by Virgil Miller's motorcycle. Miller, who had crossed the center line of a county road, was killed. He was uninsured.

As a result of the accident, doctors amputated Steven's left leg below the knee. His pelvis was severely fractured, and he suffered numerous internal injuries including a ruptured spleen and a collapsed lung. His left arm and shoulder remain paralyzed, and he suffers from a severe loss of function and nerve damage in his left side up into his neck. His vocal chord is paralyzed, leaving him with a weak and raspy voice.

Theresa Imlay suffered a badly fractured pelvis and severe soft tissue and tendon damage to her left knee and ankle. She also injured her left wrist.

At trial, the Imlays introduced the results of two blood alcohol tests performed on Miller during an autopsy indicating blood alcohol levels of .20 and .25. Dr. Raymond Sanford, the coroner, testified that he drew two blood samples from Miller's body at 6:30 a.m. on June 17, 1984. Miller had died at 12:47 a.m. During his examination of the body, he noted various internal injuries to Miller's organs, some of which allowed watery fluids to escape into his system. Sanford testified that blood samples usually are not taken from the chest because of the risk of contamination. Due to the lack of blood in the heart and inner arm, however, he drew blood, some of which was semi-clotted, from Miller's

chest cavity. Sanford also stated that consumption of a large quantity of alcohol could raise the risk of contamination because of possible diffusion of alcohol from the stomach into the chest cavity. Risk of diffusion increases with the length of delay between death and autopsy. He was not sure the samples were not contaminated.

Sanford sent one sample to the Bureau of Criminal Apprehension (BCA) and the other sample to a hospital. The BCA results showed a blood alcohol level of .25, while the hospital's results indicated a .20 blood alcohol level.

Dr. Richard Jensen, a toxicologist and former assistant director and coordinator of the BCA's chemical program, testified that trauma in the general location of the sample sites would alter the blood concentration of the sample by allowing body and lung fluids to mix with the blood and alcohol. Bodily fluids, which have a higher water content than whole blood, could inflate blood alcohol content because alcohol is attracted to water.

Finally, Jensen stated that a 20% difference between the two tests indicated unreliability. BCA standards dictate that alcohol test results be within 10%. Over respondents' objection, the trial court admitted evidence of the blood alcohol content determined by both laboratories.

After testimony by another expert and by witnesses present when Miller was served alcohol, the jury found that the city illegally sold Miller an alcoholic beverage and that the sale caused or contributed to Miller's intoxication. The jury determined that the city was 20% at fault and Miller was 80% at fault, and awarded Steven $1,601,212 in past and future damages and Theresa $600,000 in past and future damages, a total of $2,201,212.

Prior to trial, the Imlays received $703,-326.79 in uninsured motorist benefits from their insurer, Milwaukee Guardian Insurance, Inc. In addition, they received $192,-370.20 from their health insurer, State Farm Insurance Company.

Following post-trial motions, the trial court, pursuant to Minn.Stat. § 548.36, first deducted the $703,326.79 in uninsured

motorist benefits and then reduced the judgment against the city by another 60% pursuant to Minn.Stat. § 604.02, subd. 1. The trial court awarded interest on $150,-018.65.

### ISSUES

1. Does Minn.Stat. § 604.02, subd. 1 (1986) violate the equal protection clauses of the United States and Minnesota Constitutions?

2. Does a municipality's purchase of liability insurance constitute a waiver of the limitation on liability provided for by Minn. Stat. § 604.02, subd. 1 (1986)?

3. Did the trial court properly deduct the full value of collateral sources from the verdict pursuant to Minn.Stat. § 548.36 (1986)?

4. Did the trial court properly calculate the interest due to appellants?

5. Did the trial court properly admit results of the blood alcohol tests?

### ANALYSIS

1. *Minn.Stat. § 604.02, subd. 1*

■ Minn.Stat. § 604.02, subd. 1 (1986) provides:

When two or more persons are jointly liable, contributions to awards shall be in proportion to the percentage of fault attributable to each, except that each is jointly and severally liable for the whole award. * * *

If the state or a municipality as defined in section 466.01 is jointly liable, and its fault is less than 35 percent, it is jointly and severally liable for a percentage of the whole award no greater than twice the amount of fault, including any amount reallocated to the state or municipality under subdivision 2.

The trial court determined that under subdivision 1, the city's liability amounted to 40%, twice the jury's finding of 20% fault. The Imlays contend that subdivision 1 violates the equal protection clauses of the United States and Minnesota Constitutions because the section limits the liability of

municipal liquor vendors, but not of private liquor vendors.

When reviewing the constitutionality of a statute, appellate courts presume the statute is constitutional. *Miller Brewing Co. v. State*, 284 N.W.2d 353, 356 (Minn.1979). The party challenging the statute must prove unconstitutionality beyond a reasonable doubt. *Head v. Special School District No. 1*, 288 Minn. 496, 505, 182 N.W.2d 887, 893 (1970), *cert. denied sub nom., Minneapolis Federation of Teachers v. Spannaus*, 404 U.S. 886, 92 S.Ct. 196, 30 L.Ed.2d 168 (1971). The rational basis standard applies to constitutional attacks of statutes that limit state and municipal tort liability. *Lienhard v. State*, 431 N.W.2d 861, 866 (Minn.1988).

In determining whether a statute meets the rational basis standard, Minnesota courts apply a two-factor test:

1. Does the challenged legislation have a legitimate purpose? and

2. Was it reasonable for the lawmakers to believe that the challenged classification would promote that purpose?

*Id.* at 866–67. The Imlays argue that providing a liability cap for municipal liquor vendors but not for non-municipal liquor vendors has no legitimate purpose. We disagree.

Minnesota courts have stated that protecting the economic stability of municipalities and attempting to lower insurance rates is a legitimate legislative purpose. *See Snyder v. City of Minneapolis*, 441 N.W.2d 781, 788–89 (Minn.1989); *Lienhard*, 431 N.W.2d at 867; *Johnson v. Farmers Union Central Exchange, Inc.*, 414 N.W.2d 425, 431 (Minn.Ct.App.1987), *pet. for rev. denied* (Minn. Nov. 24, 1987). In addition, Minnesota courts also have upheld statutes which, like Minn.Stat. § 604.02, subd. 1, place a cap on municipal liability. *See Snyder*, 441 N.W.2d at 788–89; *Lienhard*, 431 N.W.2d at 867–68.

This court has stated that section 604.02 was amended in 1986 to protect municipalities from higher insurance rates and judgment awards when a municipality was jointly and severally, rather than solely, liable. *See Farmers Union Central Ex-*

*change, Inc.*, 414 N.W.2d at 431. As other courts have held, we hold that the purpose of subdivision 1 is legitimate. The Imlays argue, however, that protecting municipal finances is not a legitimate purpose when the municipality is engaged in the sale of liquor, traditionally not a governmental function.

The codified version of the Tort Reform Act does not distinguish between proprietary and governmental functions. Moreover, in 1986 the legislature passed the Municipal Tort Liability Statute, which specifically provides that a municipality is subject to liability for its torts regardless of whether they arise from a governmental or proprietary function. *See* Minn.Stat. § 466.02 (1986). Section 604.02 was enacted to protect municipalities from large judgments by placing a cap on their liability. Making distinctions between governmental and proprietary functions does not further that purpose.

The Imlays did not address the reasonableness factor in their arguments. Nevertheless, we must determine whether Minnesota lawmakers could have reasonably believed that the limitation on municipal joint and several liability would promote protection of the financial stability of municipalities.

Minn.Stat. § 604.02, subd. 1, places a cap on a municipality's liability as long as the municipality's fault is less than 35%. Limiting a municipality's exposure to large judgments when the municipality's fault is relatively low furthers the purpose of the statute by reducing judgments.

### 2. *Waiver of Immunity*

Minn.Stat. § 466.06 (1986) provides, in pertinent part:

The governing body of any municipality may procure insurance against liability of the municipality and its officers, employees, and agents for damages resulting from its torts and those of its officers, employees, and agents, including torts specified in section 466.03 for which the municipality is immune from liability. The insurance may provide protection in

excess of the limit of liability imposed by section 466.04. * * * The procurement of such insurance constitutes a waiver of the defense of governmental immunity to the extent of the liability stated in the policy but has no effect on the liability of the municipality beyond the coverage so provided.

We believe the trial court correctly determined that the city's purchase of insurance was not a waiver of section 604.02's limit on liability.

Minn.Stat. § 466.15 (1988), which has been in effect since 1963, provides that Chapter 466 does not apply to lawsuits commenced under the Dram Shop Act. This case was commenced under the Dram Shop Act. Under Minn.Stat. § 466.15, section 466.06 does not apply to this case.

■ In addition, by its language, Minn. Stat. § 466.06 applies exclusively to waivers of immunities conferred by Minn.Stat. § 466.03 (1986). *See Nelson v. House*, 402 N.W.2d 639, 641–42 (Minn.Ct.App.1987), *pet. for rev. denied* (Minn. May 18, 1987) (holding that section 466.06 governs waiver of immunities conferred by section 466.03). Minn.Stat. § 604.02, subd. 1 limits municipal liability to twice the amount of a municipality's fault if the fault is less than 35%. The section does not waive liability nor does it confer immunity. Rather, it sets a cap on the amount that a municipality can be required to pay.

### 3. Deduction of Collateral Sources

Minn.Stat. § 548.36 (1986) provides, in pertinent part:

Subdivision. 1. **Definition.** For purposes of this section, "collateral sources" means payments related to the injury or disability in question made to the plaintiff, or on the plaintiff's behalf up to the date of the verdict, by or pursuant to:

&ast; &ast; &ast; &ast; &ast; &ast;

(2) health, accident and sickness, or automobile accident insurance or liability insurance that provides health benefits or income disability coverage; except life insurance benefits available to the plaintiff, whether purchased by the plaintiff or provided by others, payments made pursuant to the United States Social Security Act, or pension payments;

&ast; &ast; &ast; &ast; &ast; &ast;

Subd. 2. **Motion.** In a civil action, * * * when liability * * * is determined by the trier of fact, and when damages include an award to compensate the plaintiff for losses available to the date of the verdict by collateral sources, a party may file a motion within ten days of the date of entry of the verdict requesting determination of collateral sources. If the motion is filed, the parties shall submit written evidence of, and the court shall determine:

(1) amounts of collateral sources that have been paid for the benefit of the plaintiff or are otherwise available to the plaintiff as a result of loss except those for which a subrogation right has been asserted;

&ast; &ast; &ast; &ast; &ast; &ast;

Subd. 3. **Duties of the court.** (a) The court shall reduce the award by the amounts determined under subdivision 2, clause (1).

&ast; &ast; &ast; &ast; &ast; &ast;

The Imlays argue that the trial court erred in deducting collateral source payments from the jury's verdict pursuant to Minn. Stat. § 548.36, subd. 1(2).

a. *Constitutionality of section 548.36 as applied.* Personal injury plaintiffs are not members of a suspect class, and the right to recover tort damages is not fundamental. *Farmers Union Central Exchange*, 414 N.W.2d at 431. Thus, because neither a fundamental right nor a suspect class is involved here, if section 548.36 is rationally related to a legitimate government purpose, we must uphold its constitutionality. *Lienhard*, 431 N.W.2d at 867.

The purpose of section 548.36 is to prevent double recovery. *Johnson v. Consolidated Freightways, Inc.*, 420 N.W.2d 608, 614 (Minn.1988). The Imlays agree that purpose is legitimate. They argue for the first time on appeal, however, that deduction of uninsured motorist benefits as a collateral source is unconstitutional be-

cause proceeds from Miller's policy, if he had owned one, could not have been deducted as a collateral source.

In general, this court will not entertain constitutional issues raised for the first time on appeal. *St. Paul Citizens for Human Rights v. City Council*, 289 N.W.2d 402, 407 (Minn.1979). Because we believe it is in the interests of justice to do so, however, we will consider the Imlays' argument here. *See* Minn.R.Civ.App.P. 103.04.

■ Deduction of uninsured motorist benefits furthers the purpose of Minn.Stat. § 548.36 by preventing the Imlays from recovering for injuries compensated by proceeds from their uninsured motorist policy. Lawmakers could have reasonably believed that deduction of uninsured motorist benefits would prevent duplicate recovery. Although the deduction in this case seems harsh given the severity of Steven's injuries, under a rational basis standard, we cannot say section 548.36 is unconstitutional. Though the decision is not precedential, we note that this court has already upheld the constitutionality of section 548.36 in an unpublished opinion. *See Gjovik v. Breiland*, No. C6–87–1807, 1988 WL 19424 (Minn.Ct.App. Mar. 8, 1988), *pet. for rev. denied* (Minn. Apr. 28, 1988).

b. *Uninsured motorist benefits as collateral source.* The Minnesota Supreme Court has stated that automobile accident insurance is a collateral source. *See Johnson*, 420 N.W.2d at 614. The Imlays nevertheless contend that the trial court incorrectly determined that uninsured motorist benefits are a collateral source.

■ Although the court in *Johnson* did not directly address the question of whether uninsured motorist benefits are a collateral source, the court held that uninsured motorist benefits had been deducted correctly as a collateral source. Under *Johnson*, the trial court here correctly deducted the $703,326.79 in uninsured motorist benefits received by the Imlays.

c. *Subrogation rights.* Minn.Stat. § 548.36, subd. 2(1) provides that the court shall determine and deduct the amount of collateral sources, but that the court can-

not deduct the amount for which a subrogation right has been asserted. *See also Buck v. Schneider*, 413 N.W.2d 569, 572 (Minn.Ct.App.1987). The Imlays argue that the trial court erred by deducting $703,326.79 in collateral sources paid to them by Milwaukee Guardian Insurance, Inc. because Milwaukee assigned its subrogation rights against the city to the Imlays. We disagree.

Before trial, the Imlays and Milwaukee entered into a settlement agreement and release. Paragraph 11 provided:

> 11. *Subrogation Right of Insurer.* Claimants assign to the Insurer their right of action against the driver or owner of the uninsured motorcycle, and grant the Insurer the full right of subrogation, including the right at anytime to bring an action in their name, by an attorney of its choice, against the driver or owner of the uninsured motorcycle. The Insurer shall pay all costs and expenses and retain all sums recovered. *In addition, the Insurer will waive any and all rights of subrogation arising under the policy or pursuant to law against the City of Lake Crystal or its municipal liquor store.*

(Emphasis added.) The Imlays contend that in the highlighted portion of paragraph 11 Milwaukee assigned them its subrogation rights against the city.

Where the language used in a contract is unambiguous, there is no room for interpretation or construction of the contract. *Carl Bolander & Sons Co., Inc. v. United Stockyards Corp.*, 298 Minn. 428, 433, 215 N.W.2d 473, 476 (1974). The meaning of the contract should then be determined in accordance with its plainly expressed intent. *Id.*

■ The language of Paragraph 11 does not assign Milwaukee's subrogation rights against the city. Near the beginning of the paragraph, when the parties agreed to transfer Imlay's rights against Miller to Milwaukees, they used the word "assign." When the parties entered into the agreement concerning subrogation rights against the city, however, they used the word "waive." The parties' failure to use

the word "assign" for all subrogation rights leads to the conclusion that they did not intend Milwaukee to assign its subrogation rights against the city to the Imlays. The express terms of the agreement state that Milwaukee waived its rights of subrogation against the city. The trial court properly found the Imlays reserved no subrogation rights and properly deducted the full amount of uninsured motorist benefits.

d. *Gross undercompensation.* The purpose of the collateral source statute is to prevent double recovery. *Johnson,* 420 N.W.2d at 614. The Imlays contend that even though they received uninsured motorist benefits, they will be grossly undercompensated and should receive an amount equivalent to the uninsured benefits from the city.

As the *Johnson* court noted, the policy against double recovery is furthered when the plaintiff recovers only those amounts not previously compensated by uninsured motorist benefits. *Id.* at 614. Here, the Imlays have already recovered benefits for the injuries compensated by uninsured motorist insurance. Allowing them to recover those amounts from the city would be to allow a double recovery.

▮ Contrary to the city's argument, the trial court correctly deducted collateral sources from the jury's total verdict before, rather than after, reducing the verdict pursuant to Minn.Stat. § 604.02. All defendants in cases with more than one defendant are entitled to the benefit of a section 548.36 deduction. Although Miller's estate apparently is hopelessly insolvent, a judgment has been entered against it, and the estate is therefore entitled to the collateral source deduction.

### 4. Calculation of Interest

Minn.Stat. § 549.09, subd. 1(b) (1988) provides that a prevailing party can receive pre-verdict interest only if the amount of its offer is closer to the judgment than the amount of the opposing party's offer. The trial court awarded the Imlays pre-verdict and post-verdict interest on $150,018.65, a figure arrived at after deducting the collateral sources allocated to past damages

from the actual past damages and multiplying that figure by .40, the city's maximum liability. Both parties argue that the trial court erred in its calculation of interest. We agree.

In *Lienhard,* also a damages cap case, the supreme court held that costs and disbursements are not subject to the limitation of tort liability under Minn.Stat. § 3.736. *Id.* at 864–65. The court held that interest was different, however, and distinguished pre-verdict and post-verdict interest. *Id.* at 865. Because pre-verdict interest is an element of damages awarded to provide compensation for injuries, the court held that pre-verdict interest was subject to the damages limitation set by Minn.Stat. § 3.736. *Id.* Post-verdict and post-judgment interest, on the other hand, compensates not for injury but for the loss of the use of money. *Id.*

▮ We find the reasoning of *Lienhard* applicable to the damages cap set by Minn.Stat. § 604.02, subd. 1. In view of the compensatory nature of pre-verdict interest, the trial court erred in assessing it. The city's maximum liability is 40% of the judgment after deduction of collateral sources. That figure is $599,154.08 plus costs and disbursements. Under *Lienhard,* however, post-verdict interest may be added to that figure.

Because the trial court's interest award did not provide separate figures for pre-verdict and post-verdict interest, we remand the case for determination of the amount of post-verdict interest from the date of the verdict to the date of entry of judgment pursuant to this opinion. Although we remand the case, we compliment the trial court for his analysis of the complex new statutes involved and for his extensive memorandum outlining his reasoning and interpretation of the statutes.

▮ In addition, we note that the proper procedure would have been to enter judgment against the city for 20% under Minn.Stat. § 604.02, subd. 1. Thereafter, the Imlays could have moved for reallocation of liability pursuant to Minn.Stat. § 604.02, subd. 2 (1986). Nevertheless,

since the trial court has already found that Miller's estate is insolvent, we do not remand the case for adherence to the proper procedure.

### 5. *Admission of Blood Alcohol Test Results*

A trial court's determination of the admissibility of blood alcohol test results is within the court's discretion. *Tate v. Commissioner of Public Safety*, 356 N.W.2d 766, 767 (Minn.Ct.App.1984). On appeal, the court will uphold a trial court's evidentiary determinations unless clearly erroneous. *State v. Palmer*, 391 N.W.2d 857, 859 (Minn.Ct.App.1986). The city argues that it is entitled to a new trial due to the trial court's alleged error in admitting the results of blood alcohol tests performed on Miller.

 The standard for admissibility of blood alcohol test results is the same in criminal and civil cases. *State v. Nelson*, 399 N.W.2d 629, 631 (Minn.Ct.App.1987). The proponent of blood alcohol test evidence need only provide prima facie proof of the trustworthiness of the test's administration. *State v. Dille*, 258 N.W.2d 565, 568 (Minn.1977). Arguments concerning possible contamination or other irregularities in taking the blood sample go to the weight of the evidence, rather than to its admissibility. *Dick v. Molitor*, 305 Minn. 390, 394, 234 N.W.2d 583, 586 (1975). The jury heard the evidence and determined that Virgil Miller was obviously intoxicated when served liquor at the Lake Crystal Municipal Liquor Store. We cannot say that the trial court abused its discretion in admitting the blood alcohol evidence.

### DECISION

Affirmed in part, reversed in part and remanded.